UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

97 MAR 21 PM 2:44

U.S. DISTRICT COURT
N.D. OF ALABAMA

JEWEL R. PITTS, as                    )
administratrix of the estate          )
of Charles M. Pitts, Jr.,             )
                                      )
          Plaintiff,                  )
                                      )
vs.                                   )        Civil Action No. 94-S-2663-NE
                                      )
JACKSON COUNTY, ALABAMA;              )
SHERIFF MIKE WELLS,                   )
individually and in his               )
official capacity; JACKSON            )
COUNTY COMMISSION; DENNIS             )        ENTERED
MILLER, individually and in           )
his official capacity;                )        MAR 21 1997.
STEPHEN CULPEPPER,                    )
individually and in his               )
official capacity; WAYNE              )
WELCHER, individually and in          )
his official capacity; and            )
MARSHALL-JACKSON MENTAL               )
HEALTH BOARD, INC.,                   )
                                      )
          Defendants.                 )
                                      )

## MEMORANDUM OPINION

This action arose from the death of Charles M. Pitts, Jr., who ingested a toxic substance on November 1, 1993, while incarcerated in the Jackson County Jail as a pretrial detainee, and died two days later. Plaintiff is his widow. Her amended complaint asserts claims against all defendants based on 42 U.S.C. § 1983 for alleged deprivations of rights secured to her decedent by the United States Constitution. She also alleges several state law claims.

The action presently is before the court on motions for summary judgment filed by all defendants. Additionally, defendants Marshall-Jackson Mental Health Board and Stephen Culpepper filed a

1

motion to exclude or limit testimony by plaintiff's expert witnesses. Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that plaintiff's federal claims should be dismissed. Additionally, the court determines that it will not retain supplemental jurisdiction over plaintiff's state law claims.[1]

## OUTLINE OF DISCUSSION

I. DISCUSSION OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . 3
   A.   Events Occurring in Illinois . . . . . . . . . . . . . . . . . . 4
       1.   November 27, 1984: first apparent suicide attempt  . .  4
       2.   July 19, 1985 drug overdose . . . . . . . . . . . . . . . 5
       3.   January 24, 1990: second apparent suicide attempt  . .  5
       4.   September 7, 1990 custodial evaluation . . . . . . . . 6
   B.   Events Occurring in Alabama . . . . . . . . . . . . . . . . . . 7
       1.   March 18, 1993: third apparent suicide attempt . . . . 7
       2.   March 19, 1993: Stephen Culpepper's first contact  . .  8
       3.   May 24, 1993 assault of Jewel Pitts  . . . . . . . . . 10
       4.   August 8, 1993: fourth apparent suicide attempt  . . . 11
       5.   August 24, 1993: the last arrest . . . . . . . . . . . 13
   C.   Pitts' Detention in the Jackson County Jail . . . . . . . . . 14
       1.   Culpepper's September 28, 1993 consultation  . . . . . 16
       2.   Dr. Welcher's consultations  . . . . . . . . . . . . . 17
       3.   November 1, 1993: Pitts ingests toxic substance  . . . 19
   D.   November 2, 1993: First Trip to Hospital . . . . . . . . . . 20
   E.   November 2, 1993: Return to Jail  . . . . . . . . . . . . . . 24
   F.   November 2, 1993: Second Trip to Hospital . . . . . . . . . . 25
   G.   Treatment at University Hospital, Birmingham . . . . . . . . 27

II. STANDARDS FOR THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS . 27

III. THE ELEMENTS OF A § 1983 CLAIM . . . . . . . . . . . . . . . . . . . . 29
   A.   Are Defendants "Persons" Subject to Suit Under § 1983? . . . 32
       1.   Sheriff Wells and Chief Deputy Miller . . . . . . . . . 32
          a.   Official capacity claims . . . . . . . . . . . . 32
          b.   Individual capacity claims . . . . . . . . . . . 35
       2.   Marshall-Jackson Mental Health Board, Inc. . . . . . . 35
       3.   Dr. Wayne Welcher and Stephen Culpepper . . . . . . . . 36
          a.   Official capacity claims . . . . . . . . . . . . 36
          b.   Individual capacity claims . . . . . . . . . . . 36
       4.   Jackson County, Alabama and Jackson County Commission . 37
   B.   Were Defendants Acting "Under Color of" State Law?  . . . . 38
       1.   Sheriff Wells and Chief Deputy Miller  . . . . . . . . 39
       2.   Dr. Welcher and Stephen Culpepper  . . . . . . . . . . 39
   C.   Defining the Substantive Constitutional Claim Asserted . . . 41
   D.   Was There a Constitutional Deprivation?  . . . . . . . . . . 43

---

[1] The court expresses appreciation for the competent assistance of Brian Roberts Bostick, one of its law clerks, in the preparation of the following opinion.

1.   Claims against jailers subject to "deliberate indifference"
     test, while acts of healthcare providers evaluated within
     framework of "qualified immunity" defense . . . . . .   44
2.   Did Pitts have a "serious medical need"? . . . . . . .   46
     a.   Did Pitts have a serious mental health need? . .   48
     b.   Did Pitts have a serious medical need?  . . . . .   49
3.   Were the Sheriff and Chief Deputy aware of Pitts'
     needs? . . . . . . . . . . . . . . . . . . . . . . . .   49
     a.   Mental health needs: was there a "strong likeli-
          hood" that Pitts would commit suicide, of which
          his jailers were aware? . . . . . . . . . . . . .   49
          (1)   A prior suicide threat or attempt . . . . .   50
          (2)   Knowledge by the jailers . . . . . . . . .   52
          (3)   Remoteness  . . . . . . . . . . . . . . . .   54
          (4)   Genuineness  . . . . . . . . . . . . . . . .  55
          (5)   There was not a "strong likelihood" that
                Pitts would commit suicide . . . . . . . .   56
     b.   Medical needs   . . . . . . . . . . . . . . . . .   58
4.   Were the Sheriff and Chief Deputy "deliberately indif-
     ferent" to Pitts' needs? . . . . . . . . . . . . . . .   58
     a.   Mental health needs . . . . . . . . . . . . . . .   59
          (1)   Providing access to mental health treat-
                ment  . . . . . . . . . . . . . . . . . . .   60
          (2)   Screening and classification . . . . . . .   60
     b.   Medical needs . . . . . . . . . . . . . . . . . .   63
E.   Is There a Causal Nexus Between Jackson County and the Conduct
     of Which Plaintiff Complains?  . . . . . . . . . . . .   64
F.   Were Any of the Acts of Which Plaintiff Complains the Cause —
     Either in Fact or Proximately — of Her Decedent's Death?  . .   65

IV. QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . . . . .   66
     A.   Culpepper's knowledge of Pitts at the time of the challenged
          treatment . . . . . . . . . . . . . . . . . . . . . . . .   71
          1.   Comparing Culpepper's actions to those of prior medical
               defendants  . . . . . . . . . . . . . . . . . . . .   72
     B.   Dr. Welcher's knowledge of Pitts at the time of the challenged
          treatment . . . . . . . . . . . . . . . . . . . . . . . .   74
          1.   Comparing Dr. Welcher' actions to those of prior medical
               defendants  . . . . . . . . . . . . . . . . . . . .   75
     C.   Case law has not drawn a bright line staking out the medical
          defendants' conduct as unconstitutional . . . . . . . . .   80
     D.   Expert Testimony Against Culpepper and Dr. Welcher  . . . . .   81
          1.   Dr. Herlihy's opinion . . . . . . . . . . . . . . . .   82
          2.   Dr. Holt's opinion  . . . . . . . . . . . . . . . . .   83
          3.   Plaintiff's expert testimony does not aid this court .   84

V.  PLAINTIFF'S STATE LAW CLAIMS . . . . . . . . . . . . . . . . . .   84

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . .   85

## I. DISCUSSION OF UNDISPUTED FACTS

The relevant events leading to this action occurred in two
distinct periods: 1984-1992, when Charles M. "Marty" Pitts, Jr.
("Pitts") lived in Illinois; and late 1992 until Pitts' death on
November 3, 1993, when he resided in Alabama.

## A. Events Occurring in Illinois

### 1. November 27, 1984: first apparent suicide attempt

The seminal incident was archetypal, in the sense of being the first recorded performance of behavioral themes that reverberate, with embellishment and ever increasing intensity, through all subsequent events. It occurred following Pitts' divorce from his first wife, Denise Leggett.[2] Pitts cut his left forearm in an apparent suicide attempt. Police and an ambulance were summoned to his Glenwood, Illinois apartment by a "male caller who only gave his name as John," but who turned out to be Pitts himself.[3] A white female named Tammy Oriffin drove up about the same time as police, and related that:

> Pitts had called her three times at approximately 00:00 hrs., 12:45 hrs. [sic] and 01:45 hrs. In the first two calls Pitts was upset due to problems with his ex-wife and about being layed off [sic] his job.
>
> Miss Oriffin advised on the third call Pitts [said] he had cut himself and wanted her to take him to the hospital because he said "I don't want to go away."

(Plaintiff's Exhibit 1, at 4.) Police officers found a typewritten, unsigned note in Pitts' bedroom reading: "To say good-bye to someone so special/ Is near impossible/ So I will only say/ See you later!" (Id., 4, 5.) Pitts was taken to a local hospital where he

---

[2] The record is less than clear on the dates of marriage and divorce. Pitts' mother testified that Ms. Leggett married her son when he was 21 years old: i.e., during 1980, based on Pitts' January 22, 1959 date of birth. The marriage lasted four years: i.e., until sometime in 1984. No children were born of the union. (Ruby Pitts Deposition, at 17, 24.)

[3] The incident report relates that "John" described himself as "a friend and his friend needed an ambulance and squad car at 801 Glenwood-Lansing." Police had Tammy Oriffin (who is discussed in text) listen to the tape, and she confirmed "the caller was in fact Charles Pitts and that she could tell by the voice." (Plaintiff's Exhibit 1, at 4.)

4

received treatment for his cuts and then was released.

**2. July 19, 1985 drug overdose**

Seven months later, Pitts called his former wife, Denise Leggett, at 6:15 in the morning, saying he had ingested "speed" and needed an ambulance. Glenwood, Illinois police again responded, and were told the same thing by Pitts: "he'd taken speed and wanted to go to the hospital." (*Id.*, 6.) Police accordingly classified the incident as a "drug overdose," not a suicide attempt. (*Id.*)

**3. January 24, 1990: second apparent suicide attempt**

Four and a half years later, Pitts walked into the emergency room of Ingalls Memorial Hospital in Harvey, Illinois, about fifteen minutes after midnight. Once again, he had cut his wrist. Pitts said he was "depressed over fam[ily] prob[lems]": his second wife[4] and child had "left." He "wanted to kill [him]self and had tried to do so," but the "blade was not sharp enough." (Plaintiff's Exhibit 2, at 6.) Pitts later recanted those statements, asserting the nurse who reported such information "must be delusional." (*Id.*)

Pitts described himself to hospital staff as a "heavy drinker," and admitted to abuse of both alcohol and "I.V. Cocaine use," saying he last used both only 30 minutes prior to admission. He asked "to be detoxed." (*Id.*)

Shortly after self-admission, however, Pitts became "impatient" and attempted to leave the hospital; security guards were

---

[4] Referred to in evidentiary submissions only as "Ms. Broadfield." (Ruby Pitts Deposition, at 60.) She is the mother of Pitts' only child, Sarah Nicole. (Charles M. Pitts, Sr. Deposition, at 20.)

5

called to return him to an examination room. (*Id.*, 7.) About 2 a.m. he was "restrained on cart in room" and "became v[ery] angry." (*Id.* 6) He cursed hospital staff. (*Id.*) From four to six a.m., Pitts was "cooperative but ... manipulative." (*Id.*, 7) At 6:30 a.m., however, Pitts was "informed of pending disposition" by the physician on duty, and Pitts "refuse[d] to have any further testing. Demands to phone lawyer." (*Id.*) Sometime after 3 p.m. that same day, Pitts was released.

### 4. September 7, 1990 custodial evaluation

Seven months later, Pitts was imprisoned in an Illinois state penitentiary following convictions for burglary and unlawful possession of a stolen motor vehicle. During confinement, he was evaluated by a prison psychiatrist who recorded:

> The inmate ... presented with a chief complaint of "I have problems with my family — I'm going through a divorce." Patient who had a known history of chemical dependency including addiction to cocaine and heroin and who had undergone prior residential treatment also reported that since 1985 he had undergone multiple psychiatric hospitalizations following repeated suicide attempts. Patient did give a past history of treatment with anti-depressants. Patient stated that since his incarceration and impending divorce, he had been experiencing increasing problems with dysphoria, anxiety, irritability and proximal insomnia.
>
> OBSERVATION: Mental status examination revealed the subject to be alert, oriented, cooperative, able to accurately perceive his environment. There were no true hallucinations, delusions or misinterpretations. Anxiety was unremarkable. Mood and affect were not significantly depressed. There were no true obsessions, compulsions, homicidal or nor active suicidal ideations. No signs of overt thought disorder or gross organicity.

(Plaintiff's Exhibit 3, at 2 (emphasis supplied).) Pitts accepted the psychiatrist's prescription for psychotropic drugs ("Amitrip-

6

(Plaintiff's Exhibit 12, at 8.)

At Jackson County Hospital, Pitts again refused treatment, removed an I.V. from his arm, and had to be restrained by police officers. He was "combative and threatening." (Plaintiff's Exhibit 5, at 5.) Police wrestled him into a squad car: he was "[h]itting, biting, and spitting [at] anyone in close range." (Id.) He was taken to the city jail and incarcerated on charges of menacing and resisting arrest. (Plaintiff's Exhibit 12, at 5.)

**2.   March 19, 1993: Stephen Culpepper's first contact**

The following day, Scottsboro Police Officer Ralph Dawe summoned defendant Stephen Culpepper, a social worker/therapist employed by the Marshall-Jackson Mental Health Center, to the city jail, to examine Pitts.   Officer Dawe related a description of Pitts' conduct the preceding night. (Plaintiff's Exhibit 4, at 2-3: Marshall-Jackson Mental Health Center Initial Contact Report.) Culpepper's "first impression upon hearing [that] information was ... there was a possibility that Mr. Pitts was suicidal." (Mental Health Exhibit 2, ¶ 2: Culpepper Affidavit.)

Culpepper did not talk to Pitts, because he was sedated and unconscious. He nevertheless spent three hours interviewing Pitts' wife and parents.    Based upon the information they related, Culpepper revised his initial diagnostic impression. He concluded Pitts "did not suffer from any mental illness, but was instead a substance abuser."   (Id., ¶ 3.)[6]   Consequently, he

---

[6]   *See also* Plaintiff's Exhibit 4, at 3 — *Marshall-Jackson Mental Health Center Initial Contact Report* — where Culpepper wrote on March 19, 1993, after interviewing Pitts' wife and parents, "he was strictly substance abusing."

8

> did not tell the Scottsboro Police Department that I
> though Mr. Marty Pitts was suicidal. In fact, ... there
> was no reason to believe Mr. Pitts was suicidal in view
> of the detailed information which his wife and parents
> provided to me. I had no contact or communications with
> the Jackson County Sheriff's Department or Jail regarding
> this incident as there was no involvement by that
> department or jail in this arrest.

(*Id.*) Culpepper "began to make arrangements for a referral of Mr. Marty Pitts to Mountain View Hospital for substance abuse treatment." (*Id.*) The referral was canceled, however, because police told Culpepper that Illinois had an outstanding warrant for Pitts' arrest and he would be transferred there for prosecution. Two days later, Culpepper learned there was "some mistake made with the Illinois warrant and that [Pitts] had been released from the Scottsboro City Jail with suggestion to follow up with the Marshall-Jackson Mental Health Center." (*Id.*, ¶ 4.)

Culpepper arranged an appointment to discuss substance abuse treatment options for 9:00 a.m. on March 24, 1993, but Pitts "did not show up." (*Id.*; *see also* Plaintiff's Exhibit 18, at 1: Culpepper's Schedule Log.) Three additional consultations were scheduled for July 23, July 28, and August 6, 1993, but Pitts also failed to keep those appointments. (*Id.*, at 2-4.) Consequently, as discussed hereafter defendant Culpepper "did not actually meet and talk in person with Mr. Marty Pitts until on or about September 28, 1993." (Mental Health Exhibit 2, at ¶ 6.)

### 3. May 24, 1993 assault of Jewel Pitts

Two months later, Pitts was again detained by Scottsboro police — this time for assaulting his wife. Police records contain the following description:

9

> On the above date, Myself [Officer Vance] and Officer
> Latimer responded to a call concerning a woman that had
> been assaulted by her intoxicated husband. When we
> arrived, we found the female [Jewel Pitts] hiding behind
> some trees[.] She had a bruise over her right eye and a
> scratch on her forehead. She stated that he had [k]icked
> her with his boots[.] When approached arrestee, he
> stated that he was looking for her and that they had been
> fighting. He had slurred speech, and a strong odor of
> some type [of] alcoholic beverage on his breath. The
> kitchen and living room had glass broken in the floor and
> some chairs were knocked over. A door had boot marks on
> it also. He was arrested for assault 3[rd] degree family
> violence and transported to city hall. ...

(Plaintiff's Exhibit 12, at 13-14) Jewel Pitts elaborated during

deposition: she said Pitts "picked me up by my hair," hit her head

several times with the palm of his hand, choked her, and kicked

her. (Plaintiff's Deposition, at 44, 50.) She added this observa-

tion: her husband did not like police officers and, when Pitts was

arrested that night, he used "violent talk." (Id., 62.)

Jewel lived with her daughter "for quite a few days" after

that incident (id., 47), but eventually she returned to Pitts. He

continued to drink excessively, however,[7] and in July or early

August of 1993 Jewel initiated divorce proceedings "to put an end

to the abuse." (Id., 51-55.)

### 4. August 8, 1993: fourth apparent suicide attempt

On August 8, 1993, depressed over his marital situation, Pitts

---

[7] On July 17, 1993, Pitts called the Scottsboro Police, threatening
violence and demanding to speak to Culpepper. The Scottsboro Police called the
Marshall-Jackson Mental Health Center in an attempt to contact Culpepper. They
did not reach him: the hospital employee who took the call informed the officer
that the hospital staff would not get involved until Pitts had been "incarcerated
and stabilized." The hospital employee recommended that the officer take Pitts
into custody, or ask Pitts if he would wait to meet with Culpepper on the
following Monday. The officer was instructed to call back if Culpepper or the
hospital were needed for further assistance, but no such call was made.
(Plaintiff's Exhibit 4, at 5: Jackson County Hospital Contact Sheet.) Pitts also
called the hospital on August 6, 1993, claiming he was suicidal. (Id., 7.)

fastened a garden hose to the exhaust pipe of his truck, ran it into the cab, and sat there with the engine running. (*Id.*, 74.) Jewel found him unconscious from carbon monoxide, removed the hose, and he survived.

The following day, Pitts admitted himself to Columbia Valley Hospital in Chattanooga, Tennessee. During initial assessment, he told a nurse he was "thinking about dying," that he "can't go on like this," and he felt as if he was "about to lose it totally." (Plaintiff's Exhibit 6, at 6.) The provisional admission diagnosis was "major depression [with] suicidal ideations; ETOH [ethel alcohol] dependence."[8] (*Id.*, 9.)

"Soon after he was admitted," however, Pitts repeated behavior exhibited in the emergency rooms of Ingalls Memorial Hospital in Harvey, Illinois, and, Jackson County Hospital, both described earlier. He belligerently refused treatment. Dr. Wayne Kim, M.D., recorded that Pitts "apparently had second thoughts about staying in the hospital and ... he has been threatening to leave against medical advice." (*Id.*, 54.)

> Information provided by him was rather incomplete and sketchy. At any rate, according to him, he had been increasingly upset for the past three months over marital problems and he has been drinking heavily. When he drinks, he loses control over his anger and he would break things or would yell or scream at his wife. They have been married less than six months. He also admitted that he has been taking Valium and Darvocet to help him sleep at night. <u>He denies being suicidal</u>. He does not sleep well at night and his appetite is poor. <u>He complains that he feels very uncomfortable about being</u>

---

[8] Pitts revealed that he had been drinking a case of beer a day for several days, and that he drank a pint of whiskey the morning he was admitted. (Plaintiff's Exhibit 6, at 23: Valley Hospital Clinical Assessment.)

11

tyline"), but "refused referral to ... the stress management group." (*Id.*)

## B. Events Occurring in Alabama

Following his release from custody in Illinois during December of 1992, Pitts moved to Alabama. Initially, he lived with his parents, Ruby and Charles Pitts, Sr. (Ruby Pitts Deposition, at 37.) Shortly after arriving, however, Pitts began to date Jewel Brown: the former wife of his first cousin, Kenneth Brown. He moved into Jewel's home during January of 1993; the following month, they married. (Plaintiff's Deposition, at 30-33.) The union was not tranquil. Pitts drank excessively, "for days and days." (*Id.*, 47.) When drunk, he was aggressive. Sometimes, he physically abused Jewell.[5]

### 1. March 18, 1993: third apparent suicide attempt

The first Alabama incident occurred about one month after Pitts' marriage to Jewel. On this date Pitts "cut his arms and called the hospital re: <u>not coming to help</u>." (Plaintiff's Exhibit 4, at 2 (emphasis supplied).) Scottsboro Police accompanied an ambulance to Pitts' home. One of the responding officers recorded the following description of Pitts' behavior:

> Offender called and advised he cut his wrist [and] if anyone came to his assistance he would shoot them. He was convinced to come out on [the] poarch [sic] for medical treatment where he pulled a knife out of his underwear and attempted to cut officers near him but he dropped it. Knife secured by Chief Smith & he was transported to Hospital for treatment & after he was released he was arrested & began to resist.

---

[5] Jewel Pitts noted that her husband "never done anything unless he was drinking." (Plaintiff's Deposition, at 80.)

7

locked up and he does not want to stay here.

(*Id.* (emphasis supplied).) Dr. Kim recorded that Pitts "was irritable and angry" and "seemed to be rather guarded and somewhat suspicious" during their interview. (*Id.*, 55.) Pitts persisted in his denial of "homicidal or suicidal ideation." (*Id.*)

Kim's provisional diagnosis was "alcohol dependence," layered over "possible dependence with Valium"; the prognosis was "poor." (*Id.*) Kim recommended that Pitts be treated for two to three weeks in "a structured setting until his clinical condition becomes stabilized," in order to "[r]ule out borderline personality disorder." (*Id.*)

Dr. Kim was deprived of any opportunity for meaningful intervention, however. On August 10, 1993, Pitts left the hospital against medical advice. "He did say when he was leaving that he might come back in a couple of days." (*Id.*, 56.) He did not.

Instead, on August 13, 16, and 17, 1993, Pitts visited the Family Life Center in Fort Payne, Alabama. (Plaintiff's Exhibit 8.) He gave the following "Statement Of [his] Problem(s)":

> Problems with alcohol and drugs. ... Relates that he is nervous all the time. Went to an AA meeting in Scotts-boro yesterday. Reports that he got into a closet yesterday and and [sic] stayed in it for 3 hours. Relates that last night used a Valium.

(*Id.*, 5.) Pitts admitted he had experienced suicidal ideations in the past, but "denie[d] any suicidal ideas at present." (*Id.*, 7.) The clinician's diagnostic impression was "alcohol dependence" (*id.*), and he recommended that Pitts attend Alcoholics Anonymous two or three times a week. (*Id.*, 10.)

12

## 5.    August 24, 1993: the last arrest

Just seven days after Pitts' last visit to the Family Life Center — at about 8:00 p.m. on this date — Pitts and Tammy Jean Parker were traveling in his Chevrolet pick-up when pulled over by Officer Robbie Brooks of the Skyline, Alabama Police Department. (Jackson Exhibit 2.)  Brooks suspected the pair of involvement in a burglary earlier that day.  Brooks called for back-up assistance. Scottsboro Police Officer Jim Keller and Jackson County Deputy Sheriffs David Johnson and Kenneth Miller[9] responded.  Paul Butler, the victim of the burglary, also was called to the scene and identified several objects in Pitts' truck as stolen from his home.

Pitts was arrested and transported to the Jackson County Jail. The deputies noted he was intoxicated.  On the way, Pitts demanded to be taken to a doctor to "get some xanax [be]cause he was very suicidal." (*Id.*, 2.)  Deputy Johnson replied that he would be transported to the hospital after booking.  That response obviously did not please Pitts, because he "started hitting his head against the cage in patrol car several times demanding to go to E.R." (*Id.*) He threatened "to kill both officers," and later accused them of beating him.[10] (*Id.*)

Pitts was uncooperative during booking procedures: he refused to provide any information; "all he wanted to do [was] fight and

_____

[9]  Deputy Sheriff Kenneth Miller is not to be confused with defendant Dennis Miller, who is the overseer of the Jackson County Jail.

[10]  No claim has been presented by plaintiff that Pitts actually was beaten by the officers, and no evidence has been presented that would support such an accusation.

13

threatened everyone." (*Id.*)

Afterwards, Deputies Johnson and Miller drove Pitts to Jackson County Hospital for treatment of cuts on his forehead. Dr. Charles L. Hillis sutured and bandaged the wounds. In the presence of Dr. Hillis and both deputies, Pitts said "I'm going to kill myself." (Hillis Deposition, at 13.)

## C. Pitts' Detention in the Jackson County Jail

No one posted bond and Pitts was detained in the Jackson County Jail pending disposition of the charge against him for some two months and nine days prior to death.

Sheriff's deputies had been forewarned by Skyline police of Pitts' reputation for violence against law enforcement officers. As Deputy James Goolesby noted, that warning included information that Pitts allegedly had "assaulted two officers in some northern state somewhere. That he was supposed to be pretty good as far as martial arts, and he would hurt an officer." (Goolesby Deposition, at 38-39.) For that reason, as well as the belief that Pitts was an escape risk, extra precautions were taken. (Deposition of Deputy James Putman, at 108.) Jail staff were instructed to not open, or allow Pitts outside his cell, unless another guard was present. (Goolesby Deposition, at 43.)

Pitts did not cause problems, however.[11] He consequently was rewarded with privileges, such as being allowed out of his cell to

---

[11] Pitts' mother observed that, during periods of incarceration, her son generally was "a 'model' prisoner, usually working into a job of responsibility." (Plaintiff's Exhibit 4, at 3: Marshall-Jackson Mental Health Center Initial Contact Report; *see also* Mental Health Exhibit 2, ¶ 2: Culpepper Affidavit.)

14

exercise, and to make telephone calls. (Hollis Deposition, at 26.)
In fact, Pitts was belligerent on one occasion only. When denied
use of the telephone, he threatened to burn the jail. His attempt
to obtain instant gratification by intimidation failed: he still
was not allowed to use the telephone. (Ward Deposition, at 21.)

Pitts learned he could better manipulate when he employed
guile. From his arrest on August 24th until October 1st, Pitts was
housed in a two-person cell. On the latter date, he gave Deputy
James Roberts a note pleading that his cell mate be moved.

> [B]ecause of my mood changing often and sometimes
> drastic, because of all the medications I'm on and the
> reasons for my continuing doctors visit, I feel that I am
> unable to share a cell with another person. I understand
> that you are pressed for space but please find another
> spot for this man in the cell with me.

(Jackson Exhibit 11.) His request was granted. Pitts obviously
was pleased with himself. In a letter to his wife written that
same day, Pitts said: "I got rid of my roomie. Hey, I'm starting
to get my way around here. I Like it! Ha!" (Jackson Exhibit 25, at
15.)[12]

The remainder of Pitts' detention in the Jackson County Jail
was uneventful until November 1st. It was interrupted only by
occasional discussions with his lawyer and a constant exchange of
letters and telephone calls with his wife. Jewel also visited the
jail twice a week. (Plaintiff's Deposition, at 134.)

Significantly, Pitts never hinted contemplation of suicide in

---

[12] *Nota Bene* the discussion on page 18 *infra*: Pitts' request for removal of
his cellmate occurred the day after his initial conference with Dr. Wayne
Welcher, during which Pitts attempted to "convince" that psychiatrist to help him
get out of jail. (Welcher Deposition, at 48.)

any telephone conversation, letter, or visit. (*Id.*, 137.) Quite the opposite. Pitts' letters profess resolutions to give up alcohol, assert a determination to become a better husband following release from custody, and express a yearning to become "quiet and peaceful. I want to grow old with you as quietly as possible." (Jackson Exhibit 25, at 16: letter dated October 1, 1993.) His letters sound a recurring refrain: he desired to live a long time, and he longed to spend that time with his wife. Even so, during one conversation Pitts asked his wife to arrange a consultation with Stephen Culpepper. (Plaintiff's Deposition, at 102.) An appointment eventually was made for September 28, 1993.[13]

## 1. Culpepper's September 28, 1993 consultation

As noted in the discussion of events following Pitts' arrest on March 18, 1993, Culpepper did not actually talk to Pitts until this date: the only meeting between the two men. Significantly, Pitts did not disclose his attempted suicide by carbon monoxide poisoning on August 8, 1993, or his admission to Columbia Valley Psychiatric Hospital in Chattanooga the following day. (Culpepper Deposition, at 71-72.) Pitts also untruthfully denied hospitalization or counseling for psychiatric reasons. (Plaintiff's Exhibit 4,

---

[13] The appointment was not immediately arranged. Bureaucratic hurdles first had to be cleared. Jewel Pitts called Culpepper and requested he visit her husband, but Culpepper told her that he would not be allowed into the county jail unless authorized by the Sheriff's office. Accordingly, Jewel Pitts called Jackson County Sheriff Mike Wells to obtain permission. Sheriff Wells directed her to Chief Deputy Sheriff Dennis Miller, the overseer of the jail. Miller told plaintiff that jail policies required inmates requesting mental health treatment to first be evaluated by the jail physician, Dr. Joe Cromeans. (Plaintiff's Deposition, at 103-04). Accordingly, Dr. Cromeans examined Pitts on September 13, 1993, and recommended: "Charles Pitts needs [to] see Mr. Culpepper at [Jackson County] Mental Health." (Jackson Exhibit 8.)

16

at 8: Marshall-Jackson Mental Health Center Initial Service Report.)

Nevertheless, during their hour-long meeting Culpepper obtained a social, family, and medical history, and concluded that Pitts either was "severely" or "moderately depressed,"[14] but "not suicidal." (*Id.*, 13.) For that reason Culpepper did not alert the Jackson County Sheriff's Department of any possible suicidal tendencies on the part of Pitts. (Mental Health Exhibit 2, ¶ 6: Culpepper Affidavit.)

Culpepper referred Pitts to defendant Wayne Welcher, M.D., a psychiatrist under contract with Marshall-Jackson Mental Health Center, and Culpepper's involvement in Pitts' treatment came to an end. (Welcher Deposition, at 30.)

## 2. Dr. Welcher's consultations

Dr. Welcher's initial consultation with Pitts occurred on September 30, 1993. (Welcher Exhibit 1, at ¶ 5.) Welcher reviewed Culpepper's records in preparation for the conference. During their 30-minute session in Welcher's office, Pitts related problems with depression and difficulty sleeping. He disclosed his dependency upon alcohol and cocaine, but denied using cocaine during the previous three years. Welcher learned that Dr. Cromeans (the jail's contract physician) had prescribed "Mellaril" following

---

[14] Culpepper testified in his first deposition that Pitts was "severely depressed" during their September 28th meeting. (July 5, 1995 Culpepper Deposition, at 75.) Culpepper changed his testimony during a subsequent deposition, however, saying he had not reviewed his records prior to the first deposition, and that Pitts only was "moderately depressed" on September 28th, as evidenced by his records from that meeting. (July 30, 1996 Culpepper Deposition, at 69-70.)

17

Pitts' detention.[15]    Welcher conducted a mental status exam,
concluded that Pitts suffered from "major depression,"[16] and
prescribed (in addition to Mellaril) "Sinequan": an anti-depressant
medication.[17] (Welcher Deposition, at 38, 47, 60.)  Significantly,
during this first meeting Pitts attempted to "convince" Dr. Welcher
to help him get out of jail.  (*Id.*, 48.)[18]

Welcher saw Pitts three more times: October 4, 11, and 28,
1993.  (Welcher Exhibit 1, at ¶¶ 5-8.)  On October 4th,  Welcher
conducted a 15-minute consultation, during which Pitts reported the
Sinequan was helping him sleep better, but he still was having
problems with anxiety. Welcher prescribed "Vistaril": a minor, non-
addicting tranquilizer. (Welcher Deposition, at 69-70.)

On October 11th, Welcher again met with Pitts for approximate-
ly 15 minutes.  He still was having trouble sleeping, and was
upset.  Welcher increased his Sinequan dosage and continued the
prescription for Vistaril.  (*Id.*, 71.)

On October 28th, Pitts related his concerns over the possibil-

---

[15]  Dr. Welcher described Mellaril as "a major tranquilizer that's very
sedating.   It's used in large amounts to treat psychosis.   It's used quite
frequently in smaller amounts to treat anxiety disorders, people who are anxious
and tense.  Particularly [it] is used for persons who have problems with chemical
addiction, because you cannot become addicted to Mellaril." (Welcher Deposition,
at 42.)

[16]  Dr. Welcher noted the following characteristics associated with "major
depression": a depressed mood, loss of interest, loss of appetite, poor sleep,
initial or terminal sleep disturbances, feeling apathetic, feeling hopeless,
feeling helpless, and despair.  (Welcher Deposition, at 40.)

[17]  Dr. Welcher described Sinequan as an antidepressant that is prescribed
to "bring [a person] up." (Welcher Deposition, at 61.) He noted that Mellaril
and Sinequan frequently are used together. (*Id.*)

[18]  See the discussion on page 15 *supra*: the day after Pitts asked Dr.
Welcher to help him get out of jail, he requested jail wardens to remove his
cellmate.

18

ity of receiving a long sentence as an habitual offender. Welcher increased the Sinequan dosage once more, renewed the prescription for Vistaril, and told Pitts he would see him again in two weeks. (*Id.*, 72.) Other events intervened, however.

Dr. Welcher testified "[i]t was my professional opinion then, and it remains my opinion today, that Mr. Pitts was not suicidal at the time of my evaluations of him." (Welcher Exhibit 1, at ¶ 9.) Instead, Welcher concluded that Pitts' "prevailing problem was one of anxiety in trying to manipulate the system." (Welcher Deposition, at 70.) Accordingly, Welcher — like Stephen Culpepper — did not alert the Jackson County Sheriff's Department to take any extraordinary precautions. (*Id.*, 76-77.)

**3. November 1, 1993: Pitts ingests toxic substance**

A bond reduction hearing was scheduled for November 2, 1993. Pitts became increasingly anxious as that court date approached: he feared remaining in jail. (Plaintiff's Deposition, at 130, 134.)

About one hour before midnight on the eve of his court date, another inmate told Deputy Putman that Pitts was ill and needed to talk to him. Putman walked to Pitts' cell and asked what was wrong. Pitts responded, "Well, I feel like I've been poisoned." (Putman Deposition, at 67.)

Putman searched the jail for a bottle of "Pepto Bismol," in hopes that would settle Pitts' stomach. When he could not find any, Putman gave another deputy some of his own money, and sent him to purchase a bottle. The deputy returned within a half hour. Putman took the medicine to Pitts, who drank some, but vomited

19

immediately.[19]  Putman summoned Deputies Ruben Rousseau and Jackie Coates and ordered them to take Pitts to Jackson County Hospital. (*Id.*, 72.)

## D.   November 2, 1993: First Trip to Hospital

They departed the jail just after midnight and reached the Jackson County Hospital Emergency Room a few minutes later, during the early morning hour of November 2, 1993. (Coates Deposition, at 10, 12.)  Deputy Rousseau observed that Pitts then "was in control of himself.  He was maneuvering normally, appeared to me.  I saw nothing physically ... wrong with him."  (Rousseau Deposition, at 16.)  Rebecca L. Gerlach, M.D., was the attending physician on duty in the emergency room when Pitts arrived.  Her initial impression was similar to Deputy Rousseau's: Pitts was a "well-developed, well-nourished white male in no apparent distress."  (Gerlach Deposition, at 24 (emphasis supplied).)  Rather, Pitts'

> [p]upils were equally round and react[ed] to light. Extraocular muscles were intact.  He was awake and alert. He could move all his extremities well.  He responded appropriately to questions.

(*Id.*, 25.)

Nevertheless, Pitts complained of nausea and vomiting, and said he had been throwing up blood.  Pitts also remarked "he thought he had been poisoned; but did not say how he may have been poisoned."  (Plaintiff's Exhibit 43, at 1: *Gerlach Affidavit.*)  Gerlach asked Pitts when, how, and by what he might have been poisoned, but "[h]e was very vague...."  (Gerlach Deposition, at

---

[19]  Pitts told Putman he was "throwing up blood."  (Putman Deposition, at 72.)

20

31.)

Pitts revealed anxiety over the court hearing scheduled later that day, but denied "saving up his medication and overdosing." (Id., 36; see also Plaintiff's Exhibit 5, at 24.) "[W]hen ... asked ... if he had ingested anything, he denied it." (Gerlach Deposition, at 113.) Gerlach asked Pitts "if he were feeling so bad that he would want to hurt or kill himself," but he denied the suggestion with "[a]n emphatic no." (Id., 37.)

Preliminary laboratory analysis of Pitts' blood indicated "metabolic acidosis." (Id., 44, 53, 114-15.) Gerlach then "realized he was, indeed, very sick." (Id., 56; see also id., 59.) She asked Pitts to consent to admission in Jackson County Hospital or, preferably, Huntsville Hospital.

Pitts did not want to talk about that, however. Instead, he asked Gerlach to remove his shackles: he "became fixated on the fact that he had shackles on his arms and feet, ankles, and ... he wanted to be out of the shackles." (Id., 40.) The deputies previously had told Gerlach the irons were a necessary precaution, because Pitts had a reputation for violence and was considered an escape risk. Gerlach also knew there was no medical reason to remove Pitts' shackles, and so she refused his request.[20] That obviously did not please Pitts, because "he refused to be admitted

---

[20] Dr. Gerlach recorded the following statement in her notes of treatment on the morning of November 2, 1993: "As shackles are not interfering with medical therapy, patient is ambulating without neurological imbalance, and purportedly patient has had aggressive behavior in the past, including assault of a law enforcement officer, I cannot authorize release of shackles." (Gerlach Deposition, at 134 (emphasis supplied).)

21

when he was advised that the shackles would not be removed...."
(*Id.*, 55.)

Gerlach attempted to change Pitts' mind: she told him "he was
at risk of losing his life" (*id.*, 59.) if he did not consent to
hospitalization and treatment. (*Id.*, 132-33.) Pitts conceded he
was "sick," and acknowledged an understanding of the consequences
of refusing treatment — which included such problems as seizures,
arrhythmias, and death (*id.* 132) — but he nevertheless "chose not
to have the treatment." (*Id.*, 65.)

Gerlach asked for permission to talk to family members, but
Pitts refused that also. (*Id.*, 122, 134-35.) He refused to drink
a cola containing "Actidose" and "Sorbitrol."[21] (*Id.*, 138-39.) He
refused to allow blood to be drawn for analysis of arterial blood
gas. (*Id.*, 135) He "refused to participate in the drug and urine
screening." (*Id.*, 61.)

Gerlach remonstrated with Pitts for several hours, but he
persisted in his refusal to submit to treatment. Removal of his
shackles remained the "point of focus for the patient." (*Id.*, 40.)
At approximately 3:30 a.m. on November 2nd, Dr. Gerlach wrote in
her treatment notes: "He refuses admission unless the shackles can
be removed and prefers to return to jail if shackles cannot be
removed." (*Id.*, 133.)

---

[21] "Actidose" essentially is 100 grams of charcoal, and it is used to
"absorb any substance that he might have ingested so that it would not have gone
into his bloodstream," whereas "Sorbitrol" is "a cathartic [to] cleanse ... his
system more quickly." (Gerlach Deposition, 135, 138-39.) The nursing notes
record, independently of Dr. Gerlach's notes, that Pitts refused this mixture
saying, "I know what it does, it absorbs drugs in your stomach. I haven't taken
any drugs except what the doctor gave me." (Plaintiff's Exhibit 5, at 31
(emphasis supplied); see also Gerlach Deposition, at 139.)

22

Shortly after four in the morning, Pitts "reached over and took his IV out and said I don't want this; I want to go back to my jail." (*Id.*, 61.) Vella Thornhill, one of the registered nurses on duty, independently recorded in her notes:

> 4:12 A.M.   Pulled IV line from arm.   Catheter intact. Bleeding controlled [with] pressure.   Restlessly pacing. Refuses to allow family to be called.   Refuses hospital-ization. ... States "I want to go now." ...

> 4:15 A.M.   Refuses to give phone # for wife to come to ER.   Refuses blood or urine drug screen.   Language becoming abusive.   AMA form signed.   Condition explained and results of refusal of medical [treatment] explained.

(Plaintiff's Exhibit 5, at 31; *see also* Gerlach Deposition, at 139-41.)   At that juncture, Dr. Gerlach required Pitts to sign a release form, confirming he was leaving the hospital against medical advice.[22]

The deputies who accompanied Pitts telephoned Sheriff Wells, to inform him of the situation.   Sheriff Wells instructed them "[t]o bring him back to jail, to keep a close eye on him, to talk with him and try to persuade him to accept the medical attention, but that under no circumstances would we leave him there [at the hospital] unattended."   (Wells Deposition, at 104.)   Dr. Gerlach similarly instructed the deputies to monitor Pitts' condition, and to return him to the hospital if his condition worsened.

---

[22] Jackson Exhibit 26: "Release from Responsibility for Discharge," dated November 2, 1993, signed by Pitts, and reading:

> This is to certify that I, Charles Pitts, a patient in Jackson Co. Hospital, am being discharged against the advice of the attending physician of the hospital administration.   I acknowledge that I have been informed of the risk involved and hereby release the attending physician and the hospital from all responsibility for any ill effects which may result from such discharge.

23

Pitts was discharged at 4:30 a.m. He still was ambulatory, able to walk on his own. (Gerlach Deposition, at 128.)

**E. November 2, 1993: Return to Jail**

Pitts was returned to the jail about 4:45 a.m. (Putman Deposition, at 77.) Deputy Putman was told how Pitts had refused medical treatment, and that his condition should be monitored. (*Id.*, 80.) Putman walked to Pitts' cell several times, each time asking if he was feeling any better. Sometimes Pitts would answer "no," other times he merely would shake his head in a manner indicating that he was not. (*Id.*, 89-90.) However, Pitts never asked to be taken back to the hospital: "[i]f he had of," Putman declared, "I would have carried him right back." (*Id.*, 101-02.)

Deputy Hester Hollis reported for duty in the jail around 6:30 a.m. on the morning of November 2, 1993. Putman briefed him on Pitts' condition, and Hollis made his first round through the jail at 6:50 a.m. (Hollis Deposition, at 31-32.) When he approached Pitts' cell, he observed that Pitts appeared flushed, and that his speech was "slurred and real hard to hear." (*Id.*, 42.)

At 7:36 a.m., an inmate told Hollis that Pitts had collapsed. Hollis and an inmate placed Pitts on his bed. Hollis asked Pitts several times if he wanted to go to the hospital, but Pitts mumbled "no." Finally, Hollis asked Pitts if he would allow paramedics to "check him out." Pitts consented. Paramedics were called at 7:45 a.m. and arrived at 7:53 a.m. They examined Pitts and determined he should be returned to the hospital. (*Id.*, 51-53.)

24

## F. November 2, 1993: Second Trip to Hospital

Deputy Bruce Ward followed the ambulance to Jackson County Hospital. They arrived about 8:00 a.m. (Ward Deposition, at 75.) During this second trip to the emergency room, Pitts was attended by Dr. Charles L. Hillis: the same physician who had cared for Pitts' wrist cuts on March 24th, and, his scalp lacerations on August 24th. Dr. Hillis therefore was aware of Pitts' pugnacious propensities. (Hillis Deposition, at 19.)

Pitts again was uncooperative. He refused an IV, and it was only after he became more lethargic, and "for all practical purposes unconscious," that Dr. Hillis could render treatment. (Hillis Deposition, at 21-22.) Hillis opined that Pitts had ingested ethylene glycol, possibly in the form of antifreeze.[23] (Id., 21-23.)

Deputy Ward called Sheriff Wells several times, to update Pitts' condition. Significantly, Dr. Hillis told Ward that Pitts' condition was not life-threatening, but he nevertheless recommended that Pitts be transferred to University Hospital in Birmingham for further treatment. Pitts' parents asked that he be transported by helicopter. Pitts was conveyed by ground transport, however, because Dr. Hillis did not believe his condition to be life-threatening. Deputy Ward accompanied the ambulance paramedics. (Ward Deposition, at 68-70.) They departed shortly after noon on November 2nd. (Id., 75.)

---

[23] It is unclear from the record whether Pitts consumed antifreeze or some other substance, such as cleaning fluid.

About that same time, Deputy Hollis was cleaning Pitts' cell.
He discovered a small orange cap containing some type of cleaning
fluid, and, two letters to Pitts' wife. (Hollis Deposition, at 76-
77.)  One of the letters bears the date and time it was written —
"November 1st, 1993/ Monday 6:35 AM" — and talks of being "very,
very tired":

> tired of someone having complete control over my life ...
> tired of sitting here locked up in a steel room ... tired
> of someone shoving food through a hole, when they decide
> it's time for me to eat ... tired of calling you only
> when someone decides to let me ... tired of seeing you
> through a screen, only at certain times.  I'm tired of
> hurting Baby, and I'm tired of watching you hurt.  I'm
> tired of living Jewel. I can't do five years in prison.
> I just can't.  I can't live like that again.
>
>      ... I can't live in prison anymore.  If it was one
> or two years, I might be able to handle it but, they want
> me to stay there until I'm gray.  I can't do that Jewel.
> I hope you can understand that.

(Plaintiff's Exhibit 56, at 6-7.)   The longest and most poignant
letter is undated.  (*Id.*, 3-5.)  It reads in part:

> My Dearest Jewel,
>
>      I know all the explanations in the world won't be
> good enough for what I've done.  But ... I want to try
> and explain why.
>
>      Honey, first let me say that I love you and it's
> very hard for me to leave you alone.  I know doing this
> is selfish and I know its going to hurt you terribly.
> I'm sorry Baby!  I don't want to see you hurt anymore.
> But, I thought about this very hard and I feel that this
> is best for all parties involved.  I know I have no right
> to make your choice for you but I know I could never make
> you understand why I'm doing what I'm doing.  Honey I
> just can't do anymore time in prison.  I might be able to
> handle a year or even two but they want to put me there
> until I'm gray.  There's just no way I can do that. ...
> Maybe what I'm doing is drastic but I can't see another
> way out.

. . . .

26

> Jewel, don't blame yourself for this. I've done all this to us. I was the one that almost destroyed our marriage. I was the idiot that started drinking and raising caine [sic]. You tried to stop it but, I wouldn't. We could of had a wonderful life but I blew it! It's all my fault. Not yours. Now its me making the choice to end my life. I'm tired Jewel and I don't have the strength to go on like this. I just can't live like this. I hope someday you'll understand. I hope someday you'll find it in your heart to forgive me for what I've done to us. ...

. . .

Your Loving Husband

Marty

## G.   Treatment at University Hospital, Birmingham

The record is silent on several important facts: e.g., Pitts' condition and treatment en route; when the ambulance bearing him arrived at University Hospital; what treatment he received there; etc. All this court knows is that further attempts to save Pitts' life were unavailing, and he died on November 3, 1993. (Plaintiff's Exhibit 30: Death Certificate.)

## II. STANDARDS FOR THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis supplied.)

The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material

27

fact exist to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(per curiam). Rule 56 permits the movant to discharge this burden <u>with</u> or <u>without</u> supporting affidavits. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are <u>not</u> unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if the reasonable fact finder evaluating the evidence

28

could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## III. THE ELEMENTS OF A § 1983 CLAIM

The primary areas of focus in cases based upon 42 U.S.C. § 1983 are two: whether the conduct complained of was committed by a person acting under color of state law; and, whether that conduct deprived plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States. *See, e.g., Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *see also Burch v. Apalachee Community Mental Health Servs., Inc.*, 840 F.2d 797, 800 (11th Cir. 1988), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

Even so, those basic inquiries provoke numerous subsidiary questions, such as: are defendants "persons" under the statute?;

29

were defendants acting "under color of" state law?; what were the rights, privileges, or immunities secured by the Constitution and laws of which plaintiff (or, in the context of this case, plaintiff's decedent) allegedly was deprived?; and, was there in fact a constitutional deprivation?

In addition, even though it rarely is mentioned in reported decisions, "causation is an essential element of a section 1983 cause of action." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).

> Causation is a concept that is not often discussed or explicitly stated in civil rights cases. When courts examine the elements of civil rights causes of action, they tend to focus on the substantive aspects of liability under the statutes. ... Although causation is not stated explicitly in these formulations, it is an implicit requirement. ...

*Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citation omitted). Causation under § 1983 has two components: both causation in fact and proximate causation.[24] "The causation requirement of section[] 1983 ... is not satisfied by a showing of mere causation in fact. ... Rather, the plaintiff [also] must establish proximate or legal causation." *Id.* (citation omitted).[25]  Causation is a primary issue at the summary judgment

---

[24]  Causation — both causation in fact and proximate causation — is an essential element of a § 1983 claim. *See, e.g.*, Reimer v. Smith, 663 F.2d 1316, 1322 & n.4 (5th Cir. 1981) (it is axiomatic that a plaintiff cannot succeed in a section 1983 action if he or she fails to demonstrate a causal connection between the state official's alleged wrongful and the alleged deprivation). *See generally*, Randall R. Rader, *Section 1983, The Civil Civil Rights Action: Legislative and Judicial Directions*, 15 CUMB. L. REV. 571, 601-607 (1985), providing a useful discussion of the causation element in a § 1983 action.

[25]  The Fifth Circuit promulgated the following pattern jury instruction for use in connection with § 1983 claims:

30

stage, when a determination must be made as to whether a municipal-
ity or county government can be held liable for its custom or
policy. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109
S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989)("a municipality can be
found liable under § 1983 only where the municipality itself causes
the constitutional violation at issue").

Finally, a plaintiff must prove his or her damages, or basis
for entitlement to equitable relief. Monetary damages are governed
by the same basic principles that prevail in tort law and normally
will be satisfied by showing that defendant's conduct caused some
actual damage. Additionally, if a plaintiff seeks equitable
redress under the statute, he must establish that he is entitled to
the specific remedy sought. *See City of Los Angeles v. Lyons*, 461
U.S. 95, 105, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983)(plaintiff
lacked standing to seek injunctive relief where he could not
demonstrate that he was in imminent danger of future harm).

In sum, there are six elements to a *prima facie* § 1983 case.
A plaintiff must show that (1) a "person" (2) acting "under color

---

The plaintiff must also prove by a preponderance of the evidence
that the act or failure to act by the defendant was a <u>cause-in-fact</u>
<u>of the damage plaintiff suffered</u>. An act or failure to act is a
cause-in-fact of an injury or damages if it appears from the
evidence that the act or omission played a substantial part in
bringing about or actually causing the injury or damages. The
plaintiff must also prove by a preponderance of the evidence that
the act or failure to act by the defendant was <u>a proximate cause of</u>
<u>damage plaintiff suffered</u>. An act or omission is a proximate cause
of the plaintiff's injuries or damages if it appears from the
evidence that the injury or damage was a reasonably foreseeable
consequence of the act of omission.

Fifth Circuit District Judges Association, PATTERN JURY INSTRUCTIONS (CIVIL
CASES) 112 (1995)(emphasis supplied).

31

of" some state law, custom, or practice (3) subjected plaintiff or another person, such as plaintiff's decedent, (4) to the deprivation of rights, privileges, or immunities secured by the "Constitution and laws" of the United States, and that (5) such conduct was the cause of (6) plaintiff's damages or basis for equitable relief. A proper analysis of plaintiff's claims requires that each of these elements be addressed in the context of the undisputed facts previously discussed.

## A. Are Defendants "Persons" Subject to Suit Under § 1983?

Jewel Pitts sued seven defendants: (1) Jackson County Sheriff Mike Wells; (2) Chief Deputy Sheriff Dennis Miller; (3) Marshall-Jackson Mental Health Board, Inc.; (4) Dr. Wayne Welcher, M.D.; (5) Stephen Culpepper; (6) Jackson County, Alabama; and (7) the Jackson County Commission. A determination of whether each is considered a "person" subject to suit under § 1983 requires separate discussion.

### 1. Sheriff Wells and Chief Deputy Miller

#### a. Official capacity claims

Neither Sheriff Wells nor Chief Deputy Miller are considered "persons" subject to suit under § 1983, when sued in their official capacities. That result flows from *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), where the Supreme Court held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." An understanding of the rationale undergirding the *Will* holding, and thereby of its application to this case, requires some

32

discussion.

To begin with, the Eleventh Amendment[26] bars suits against a state in a federal forum, "unless that State has waived its immunity, ... or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Will*, 491 U.S. at 66, 109 S.Ct. at 2309-10 (citation omitted).[27] The Court found "[t]hat Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect...." *Will*, 491 U.S. at 66, 109 S.Ct. at 2310.[28] In addition, suits against an

---

[26] The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

[27] On the other hand, the Supreme Court does not view the Eleventh Amendment as a bar to suits for prospective injunctive relief against state officials acting in their official capacity. Parker v. Williams, 862 F.2d 1471, 1475 (11th Cir. 1989) (citing Edelman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974)). *See also* Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 n.10, 109 S.Ct. 2304, 2312 n.10, 105 L.Ed.2d 45 (1989), holding that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State'." However, plaintiff does not seek prospective injunctive relief herein.

[28] In addition to its discussion of the Eleventh Amendment's impact upon the scope of § 1983, the *Will* court found that

> Congress did not intend to override well-established immunities or defenses under the common law. ... The doctrine of sovereign immunity was a familiar doctrine at common law. The principle is elementary that a State cannot be sued in its own courts without its consent." ... We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent.
>
> The legislative history of § 1983 does not suggest a different conclusion. ... Construing § 1983 as a remedy for "official violation of federally protected rights" does no more than confirm that the section is directed against state action — action "under color of" state law. *It does not suggest that the State itself was a person that Congress intended to subject to liability.*

*Will*, 491 U.S. at 67-68, 109 S.Ct. at 2310-11 (emphasis supplied) (citations omitted).

33

official acting in his or her official capacity impose liability on
the governmental entity the official represents.  *E.g.*, *Brandon v.
Holt*, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878
(1985).  "Obviously, state officials literally are persons.  But a
suit against a state official in his or her official capacity is
not a suit against the official but rather is a suit against the
official's office.  ...  As such, it is no different from a suit
against the State itself." *Will*, 491 U.S. at 71, 109 S.Ct. at 2312.

In that regard, the 1901 Constitution of the State of Alabama
provides that sheriffs are executive officers of the State.[29]  *See*
*Parker v. Amerson*, 519 So. 2d 442, 442-43 (Ala. 1987).  Therefore,
sheriffs enjoy Eleventh Amendment protection when they are sued in
their official capacities for damages under § 1983.  *Carr v. City
of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990), *reh'g denied*,
925 F.2d 1471 (11th Cir. 1991).  Moreover, deputy sheriffs are
viewed under Alabama law as "an extension of the Sheriff." *Carr*,
916 F.2d at 1526.  Eleventh Amendment immunity therefore extends to
deputy sheriffs sued in their official capacities, because of their
"traditional function under Alabama law as the Sheriff's alter
ego." *Carr*, 916 F.2d at 1527; *see also Lancaster v. Monroe County,
Alabama*, 1996 WL 529195, at *4-5 (S.D. Ala. June 24, 1996)(applying
*Carr* when holding that "jailers are entitled to Eleventh Amendment
immunity to same extent as sheriffs and their deputies").

---

[29] Article V, § 112, Alabama Constitution (1901), provides: "The executive
department shall consist of a governor, lieutenant governor, attorney-general,
state auditor, secretary of state, state treasurer, superintendent of education,
commissioner of agriculture and industries, and a sheriff for each county."
(Emphasis supplied.)

34

It follows that neither Sheriff Wells nor Chief Deputy Miller are considered "persons" subject to suit under § 1983, when sued in their official capacities, because Jewel Pitts' official capacity claims against them are functionally equivalent to claims against the entity each represents: the State of Alabama, which neither consented to this suit nor waived its Eleventh Amendment immunity. Accordingly, plaintiff's claims against those defendants in their official capacities are barred. See Parker v. Williams, 862 F.2d at 1476 n.4 ("Eleventh Amendment bars the award of damages for past injuries because such damages would be paid out of state funds").

### b.   Individual capacity claims

On the other hand, a suit against an official in his or her individual capacity is a claim against the person: relief is sought from the individual, not the governmental entity he or she represents. See, e.g., Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991); Colvin v. McDougall, 62 F.3d 1316 (11th Cir. 1995). Accordingly, Sheriff Wells and Chief Deputy Miller are "persons" for purposes of § 1983, when sued in their individual capacities. Hafer, 502 U.S. at 31, 112 S.Ct. at 365 ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983").

### 2.   Marshall-Jackson Mental Health Board, Inc.

Plaintiff concedes that her federal claim against the Marshall-Jackson Mental Health Board is due to be dismissed.

(Plaintiff's Brief, at 43.)[30]  Accordingly, it is not necessary to determine whether that defendant is a "person" for purposes of § 1983.

### 3.  Dr. Wayne Welcher and Stephen Culpepper

#### a.  Official capacity claims

As previously observed, official capacity suits "generally represent[] only another way of pleading an action against an entity of which an officer is an agent."  *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2035 n.55, 56 L.Ed.2d 611 (1978); *see also, Busby*, 931 F.2d at 776.  Thus, Jewel Pitts' official capacity claims against defendants Welcher and Culpepper are functionally equivalent to her claim against the entity that employed them: the Marshall-Jackson Mental Health Board, Inc.  And, because plaintiff concedes that she has no claim against the Mental Health Board under § 1983, it follows that she also must concede that her functionally equivalent claims against defendants Welcher and Culpepper in their official capacities are due to be dismissed.

#### b.  Individual capacity claims

On the other hand, defendants Welcher and Culpepper in their individual capacities <u>are</u> "persons" subject to suit under § 1983. The critical inquiry with regard to those defendants — *i.e.*, whether they were acting "under color of" state law — is discussed

---

[30]  "Your plaintiff concedes that Marshall Jackson Mental Health Center cannot be held liable under 42 U.S.C. Section 1983 under a respondeat superior theory.  However, for the plaintiff's wrongful death cause of action, Marshall Jackson Mental Health can be held accountable."

hereafter.

**4.   Jackson County, Alabama and Jackson County Commission**

The evolution of modern § 1983 doctrine began with *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *Monroe* opened the sluice to a "swelling tide of § 1983 actions [which] threaten[ed] to engulf the federal courts...." *Thurman v. Rose*, 575 F. Supp. 1488, 1491 (N.D. Ind. 1983). Even so, the Supreme Court attempted to limit the force of its decision by holding that the municipal defendant (City of Chicago) was not a "person" subject to suit under the statute and, therefore, could not be held liable for the actions of its officers. *Monroe*, 365 U.S. at 192, 81 S.Ct. at 486.

Blanket immunity for municipalities lasted until 1978, when the Court reversed that aspect of its holding in *Monroe*, and held that a municipality did qualify as a "person" liable to suit under § 1983. *Monell v. Department of Social Service of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The *Monell* ... decision made any city, county, or local jurisdiction subject to a lawsuit whenever one of its employees abridged any federal constitutional or statutory command." Randall R. Rader, Section 1983, *The Civil Civil Rights Action: Legislative and Judicial Directions*, 15 Cumb. L. Rev. 571, 580 (1985)(emphasis supplied)(footnote omitted).

The *Monell* Court nevertheless qualified its holding that municipalities are "persons" for purposes of § 1983, and attempted to limit the potential liability of local governmental entities by

37

also holding that "a municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. Instead, the Court concluded that city or county governments could be held liable only where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.*[31] "Thus, municipal liability attaches only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Kenneth L. Lewis, *Section 1983: A Matter of Policy — Current Overview of Municipal Liability,* 70 Mich. B.J. 556 (1991).

Counties and county commissions are brought within the definition of "person" under § 1983 by means of the same reasoning that applies to municipalities. *See, e.g., Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Welch v. Laney,* 57 F.3d 1004, 1009 (11th Cir. 1995)(noting that "Cullman County Commission could likewise be liable [under § 1983] for the acts of [the s]heriff"). Thus, Jackson County and the Jackson County Commission are "persons" under § 1983.

## B. Were Defendants Acting "Under Color of" State Law?

The second element of a *prima facie* case provokes this inquiry: were Sheriff Wells, Chief Deputy Miller, Dr. Welcher, and

---

[31] The Court also stated that a local government may be held liable under certain circumstances for a "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-91, 98 S.Ct. at 2036.

38

Stephen Culpepper acting "under color of" some law, custom, or practice when each engaged in the conduct complained of?

### 1. Sheriff Wells and Chief Deputy Miller

Sheriff Wells and Chief Deputy Miller unquestionably were acting under color of state law when operating the Jackson County Jail pursuant to authority vested in them by Alabama statutes. "[A] public employee acts under color of state law ... while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988)(citations omitted).

### 2. Dr. Welcher and Stephen Culpepper

State action also is present in the actions of Dr. Welcher and Culpepper. The state has a constitutional obligation "to provide adequate medical care to those whom it has incarcerated." *Id.*, at 54, 108 S.Ct. at 2258 (citations omitted). Whenever the state transfers that responsibility to a private entity, such as a hospital, that entity is "clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). It follows that a private physician under contract with a state to provide medical care to inmates acts "under color of state law for purposes of section 1983 when undertaking his duties." *West*, 487 U.S. at 54, 108 S.Ct. at 2258 "It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *Id.*, at 55-56, 108 S.Ct. at 2259.

39

In like manner, whenever a function that traditionally is the exclusive prerogative of a county is performed by private persons or entities, state action is present. *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 703 (11th Cir. 1985)(citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

Sheriff Wells and Chief Deputy Miller had a constitutional obligation to provide adequate medical and mental health care to detainees housed in the Jackson County Jail. *See Anacata*, 769 F.2d at 705 ("federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals"). To satisfy that obligation, they referred inmates in need of mental health services to the Marshall-Jackson Mental Health Center. That entity is Culpepper's employer, and Dr. Welcher is under contract with the Center to provide psychiatric services to patients. Thus, when those defendants undertook to provide treatment to Pitts, they were "acting under color of state law for § 1983 purposes." *Leeks v. Cunningham*, 997 F.2d 1330, 1333 n.3 (11th Cir. 1993)("A private physician ... who is under contract to provide obligatory medical services to a county jail is considered to be acting under color of state law for § 1983 purposes"); *see also Carswell v. Bay County*, 854 F.2d 454, 456-57 (11th Cir. 1988)("a private physician under contract with the Bay County Jail to provide medical services to inmates ... acted under color of state law"); *Morrison v. Washington County, Alabama*, 700 F.2d 678 (11th Cir.), *cert. denied*, 464 U.S. 864, 104

40

S.Ct. 195, 78 L.Ed.2d 171 (1983) (refusing to dismiss physician

employed by county from § 1983 action).

## C. Defining the Substantive Constitutional Claim Asserted

Plaintiff asserts deprivation of rights secured to her

deceased husband by five constitutional amendments.

> ALL ... Defendants, acting under color of law, ...
> displayed deliberate indifference to the Decedent's
> medical needs and are jointly and severally liable under
> 42 U.S.C. Section 1983 for their actions ... by depriving
> [Pitts] of the rights, privileges, and immunities
> afforded and assured him by the First, Fifth, Sixth,
> Eighth, and Fourteenth Amendments to the United States
> Constitution.

(Plaintiff's Second Amended Complaint, at ¶ 80.)    Plaintiff does

not explain how the First, Fifth, or Sixth Amendments are involved.

Further, the record reveals no facts implicating those provisions.

Rather, like the plaintiff in *Popham v. City of Talladega*, 908 F.2d

1561 (11th Cir. 1990), Jewel Pitts indiscriminately

> claims several constitutional violations in relation to
> her husband's suicide.  An aggregation of these claims
> charge, in effect, that her husband had a right to be
> protected from committing suicide while incarcerated,
> that he was not properly monitored after being placed in
> a cell by himself, and that his jailers were not properly
> trained to identify prisoners who might show a tendency
> to suicide.

*Popham*, 908 F.2d at 1563.    Accordingly, this court construes

plaintiff's complaint as presenting a § 1983 claim "for a constitu-

tional violation of substantive due process."  *Id.*

Pitts was a pretrial detainee.    It is well-settled that

Eighth Amendment prohibitions against cruel and unusual punishment

do not apply to pretrial detainees, but only convicted prisoners.

*See, e.g., Ingraham v. Wright*, 430 U.S. 651, 671-72 n.40, 97 S.Ct.

41

1401, 1412-13 n.40, 51 L.Ed.2d 711 (1977). Even so, the Eighth Amendment rights of prisoners are analogized to those of pretrial detainees under the Fourteenth Amendment, to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial. *See Roberts v. City of Troy*, 773 F.2d 720, 722 (6th Cir. 1985). The Eleventh Circuit holds that, "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care, the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Hamm v. Dekalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); *see also City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983)("the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner").

Courts that have placed a constitutional duty on jailers to safeguard inmates from suicide have done so on two theories. *See generally* James E. Robertson, *Fatal Custody: A Reassessment of Section 1983 Liability for Custodial Suicide*, 24 U. Tol. L. Rev. 807, 813-15 (1993). At least two courts have linked suicide prevention to an inmate's liberty interest in personal security. *Soto v. City of Sacramento*, 567 F. Supp 662, 682 (E.D. Cal. 1983)(liberty interest in preventing "unjustified intrusions on personal security" required "minimally safe cell"); *Holand v. Breen*, 623 F.Supp. 284 (D. Mass. 1985)(finding duty to safeguard

42

prisoners from suicide based on liberty interest against intrusions on "bodily security").

"The most common approach, however, addresses suicide as a serious mental health problem that implicates inmates' right to medical care." Robertson, *supra* at 813. That analysis derives from Justice Marshall's majority opinion in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied*, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977), where the Court held

> that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to a prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Id.*, 429 U.S. at 104, 97 S.Ct. at 291 (quoting *Gregg v. Georgia*, 428 U.S. 153, 182-83, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) - (joint opinion of Stewart, Powell, and Stevens, JJ.)). The Supreme Court later proscribed that same conduct in relation to pretrial detainees. *City of Revere*, 463 U.S. 244-45, 103 S.Ct. at 2983.

### D. Was There a Constitutional Deprivation?

To determine whether a constitutional deprivation has occurred in the death by suicide of an inmate or pretrial detainee, three questions must be asked: (1) did the deceased have a "serious medical need"?; (2) were defendants aware of that need?; and (3) were defendants "deliberately indifferent" to that known need? Plaintiff can establish a constitutional deprivation only if each

43

question is answered in the affirmative.

### 1. Claims against jailers subject to "deliberate indifference" test, while acts of healthcare providers evaluated within framework of "qualified immunity" defense

The actions of Sheriff Wells and Chief Deputy Miller will be examined by the three-prong, "deliberate indifference to serious medical needs" test. The same analysis could be applied to the actions of healthcare providers who render treatment to pretrial detainees, such as Stephen Culpepper and Dr. Wayne Welcher. *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985). Grossly incompetent or inadequate care can constitute deliberate indifference. *See Rogers*, 792 F.2d at 1058 (medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference). A doctor's decision to take an easier and less efficacious course of treatment can amount to deliberate indifference. *Id.* Failure to respond to a known medical problem can constitute deliberate indifference. *Ancata*, 769 F.2d at 704.

On the other hand, mere medical negligence (or breach of the applicable standard of care) does not constitute deliberate indifference. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292 (1976). In like manner, a simple difference in medical opinion does not rise to the level of deliberate indifference. *See Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("[W]e disavow any attempt to second-guess the

44

propriety or adequacy of a particularized course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment").

The primary distinction between a deliberate indifference test and a qualified immunity analysis is, deliberate indifference involves a subjective component, while qualified immunity scrutiny invokes only an objective reasonableness inquiry. *See Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994) ("the subjective component of deliberate indifference ... is a question for the finder of fact that is not resolved through the objective reasonableness inquiry of qualified immunity") (citations omitted).[32] Nevertheless, at least one Eleventh Circuit judge has suggested that distinctions between the two frameworks have been blurred in this circuit. *See Greason v. Kemp*, 891 F.2d 829, 841 (11th Cir. 1990) (Edmonson, J., dissenting) ("The merits of plaintiff's case and the question of qualified immunity are separate questions; we must avoid allowing the ideas to become blurred").

---

[32] In *Harris*, the court also discussed the effect on the deliberate indifference standard of a denial of a qualified immunity defense at the summary judgment stage:

> A ruling denying qualified immunity does not render the [defendant] liable for deliberate indifference. It means only that the claims against the [defendant] may proceed to trial. When the qualified immunity entitlement is lost at the summary judgment stage, additional or different facts may be discovered or developed regarding the trial questions of liability and damages. *See* Swint [v. City of Wadley, Alabama], 5 F.3d [1435,] 1438-39 [(11th Cir. 1993). At trial the facts regarding deliberate indifference may be further developed, e.g., Howell v. Burden, 12 F.3d 190, 192 n.2 (11th Cir. 1994), and the jury will determine whether the [defendant] was or was not deliberately indifferent to [plaintiff's] medical needs.

*Harris*, 21 F.3d at 394.

45

Further, an examination of the actions of medical and mental health professionals is not particularly suited to deliberate indifference analysis. As Judge Edmonson noted in his dissenting opinion in *Greason,*

> [w]hether a healthcare worker's conduct amounts to deliberate indifference so that the eighth amendment is violated is a factually sensitive issue depending on a case-by-case analysis: medicine is a delicate blend of art and science not easily measured by hard and fast rules. Therefore, rarely will a basis exist for an *a priori* judgment that a healthcare worker was deliberately indifferent and thus violated clearly established rights.

*Greason,* 891 F.2d at 842. The Eleventh Circuit has implicitly followed that reasoning by examining the acts of healthcare providers under a qualified immunity analysis. *See e.g.*, *Dolihite v. Maughon,* 74 F.3d 1027 (11th Cir. 1996); *Howell v. Evans,* 922 F.2d 712 (11th Cir. 1991); *Greason v. Kemp,* 891 F.2d 829 (11th Cir. 1990); *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir. 1989). Accordingly, this court will reserve examination of the actions of Stephen Culpepper and Dr. Wayne Welcher until discussion of their qualified immunity defenses.

### 2. Did Pitts have a "serious medical need"?

The Supreme Court in *Estelle* did not define the phrase, "serious medical need." The Eleventh Circuit nevertheless has interpreted the expression as embracing not just the physical ailments of inmates, but also their <u>mental</u> afflictions, which includes protecting prisoners and pretrial detainees from suicide. *See Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986) ("[f]ailure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of

46

prisoners"). In the words of the Fifth Circuit,

> [a] serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills. A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies.

*Partridge v. Two Unknown Police Officers*, 751 F.2d 1448 (5th Cir.), *withdrawn*, 755 F.2d 1126 (5th Cir. 1985), *and substituted opinion*, 791 F.2d 1182, 1187 (5th Cir. 1986). Accordingly, when judging whether Pitts had "serious medical needs," this court must ask, on the one hand, whether he had a serious <u>mental</u> <u>health</u> need, and, on the other, whether he also had serious <u>medical</u> needs.

The Eleventh Circuit has delineated the following standard as "the appropriate and guiding principle by which to gauge 'serious medical needs' of prisoners": "a 'serious medical need' is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994)(quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D. N.H. 1977)).

"The 'seriousness' of an inmate's medical needs also may be decided in reference to the effect of delay in treatment." *Hill*, 40 F.3d at 1188 (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)(per curiam), *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100

47

L.Ed.2d 195 (1988)). Thus, "where denial or delay [of treatment] causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Monmouth County*, 834 F.2d at 347.

### a. Did Pitts have a serious mental health need?

Pitts' death by suicide, in and of itself, strongly suggests that he had a serious mental health need. On the other hand, the evidence is subject to another interpretation: i.e., Pitts' death was the unintended result of an unsuccessful attempt to manipulate an opportunity to escape from custody. Pitts possibly intended to ingest only enough of whatever substance he consumed to create visible symptoms of illness (e.g., vomiting), which required a trip to the hospital. As part of that plan, Pitts possibly intended to manipulate the removal of his shackles during treatment, and to escape when that was done. It is unreasonable to suggest that a rational prisoner who accidentally causes his own death while attempting to escape from custody had a serious mental health need.

Nevertheless, the strength of the evidence supports suicide. The two letters found in Pitts' cell clearly support that conclusion. Regardless, a determination of whether Pitts intentionally took his own life, or died in a botched escape attempt, involves questions of material fact that are properly reserved for the jury. Thus, this court merely concludes there is sufficient evidence to support the inference that Pitts intended that which occurred. Accordingly, this court determines that there is sufficient evidence to support a finding that Pitts had serious mental health

48

needs.  *See Monmouth County*, 834 F.2d at 347.

### b.  Did Pitts have a serious <u>medical</u> need?

Pitts clearly had a serious medical need after he "poisoned" himself on the night of November 1, 1993.  He displayed several symptoms of a serious, <u>physiological</u> condition (*e.g.*, his vomitus contained blood, he was flushed and had slurred speech).  His death, in and of itself, shows that Pitts had a serious medical need.  His poor condition arguably was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hill*, 40 F.3d at 1187.

### 3.  Were the Sheriff and Chief Deputy <u>aware of</u> Pitts' needs?

#### a.  <u>Mental health</u> needs: was there a "strong likeli-hood" that Pitts would commit suicide, of which his jailers were aware?

Jailers are not required to safeguard all inmates from suicide.  Rather, only those inmates presenting a "<u>strong likeli-hood</u>, rather than a mere possibility" of suicide are entitled to protection from self-destruction.  *Edwards v. Gilbert*, 867 F.2d 1271 (11th Cir. 1989)(citations omitted), *modified, reh'g denied, Edwards v. Okaloosa County*, 23 F.3d 358 (11th Cir. 1994).  Case law indicates that a "strong likelihood" does not exist unless all of the following factors are present: (1) the inmate previously had threatened or attempted suicide; (2) the threat or attempt was known by jailers; (3) the threat or attempt was somewhat recent; and (4) it appeared genuine.  *See* Robertson, *supra*, 24 U. Tol. L. Rev. at 816-19.  This court will not evaluate the reasonableness of the jail defendants' actions until it resolves the threshold issue:

49

whether there was a "strong likelihood" that Pitts would commit suicide of which the jail defendants were aware.

### (1) A prior suicide threat or attempt

As the Eleventh Circuit has noted, "[i]n the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference." *Edwards*, 867 F.2d at 1275 (citations omitted)(footnote omitted).

Even where warning signs or characteristics of stereotypical suicidal inmates are present,[33] courts have consistently rejected § 1983 claims, unless there is evidence of a recent suicide threat or attempt that was known by jailers. Thus, courts have rejected arguments that the following purported predictors of suicide should sufficiently alert jailers to a forthcoming suicide attempt: (1) intoxication and/or violent behavior;[34] (2) "suicide hesitation cuts";[35] (3) weeping;[36] (4) being a youthful, unmarried male;[37] and

---

[33] "The typical suiciding inmate is an unmarried, intoxicated Caucasian male of about twenty-two years of age who lacks a significant history of incarceration." James E. Robertson, *Fatal Custody: A Reassessment of Section 1983 Liability for Custodial Suicide*, 24 U. TOL. L. REV. 807, 808 (1993)(footnote omitted).

[34] *See* State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir.), *cert. denied*, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983)(holding that knowledge that detainee was intoxicated, uncooperative and had attempted to assault defendants was not synonymous with having reason to know that the violence might become self-directed); Estate of Hocker v. Walsh, 22 F.3d 995, 1000 (10th Cir. 1994)(intoxicated and incoherent detainee was not a particular suicide risk); Brooks v. City of Chicago, 1992 WL 373034, at *4 (N.D. Ill. Dec. 8, 1992)(fact that detainee was belligerent and intoxicated "is not synonymous with having reason to know that he was suicidal").

[35] *See* Freedman v. City of Allentown, 853 F.2d 1113, 1115 (3d Cir. 1988)(failure to recognize large and prominent scars on the wrist, elbows and neck of detainee as suicide hesitation cuts and failure to take action to protect

50

(5) "freaky" behavior.[38]   Jails are not intended to be happy places, and depression is common among prisoners.   It is not unusual for prisoners to display signs of depression or sadness, or express concern about personal situations.   The case of *Barber v. City of Salem, Ohio*, 953 F.2d 232 (6th Cir. 1992), represents a prime example of refusal to find sufficient warning of an incipient suicide when an inmate expressed concern over the repercussions of an arrest on his personal life.   In that case, the deceased expressed to jailers

> concern over his job, his engagement, and his ability to obtain custody of his young son due to his arrest. However such a reaction to an arrest for driving under the influence of alcohol could not be considered abnormal and would not alert the jail authorities to a strong likelihood that Kenneth Robert Barber would commit suicide.

*Barber*, 953 F.2d at 240.   Indeed, egregious circumstances are required before a jailer who fails to identify a potentially suicidal inmate will be held liable under § 1983. *See generally, Partridge v. Two Unknown Police Officers*, 791 F.2d 1182 (5th Cir. 1986), *substituted opinion*, 791 F.2d 1182 (5th Cir. 1986)(deliberate indifference shown where prisoner exhibited hysterical and

_____

detainee was at most negligence, not deliberate indifference).

[36]  *See* Boyd v. Harper, 702 F. Supp. 578, 581 (E.D. Va. 1988)("'weeping' ... does not indicate a 'strong likelihood' of suicide").

[37]  *See* Dorman v. District of Columbia, 888 F.2d 159, 165 (D.C. Cir. 1989)(decedent's "docile behavior in the presence of the police, his drowsiness during booking, and the fact that he was a 'young, single male' hardly add up to a noteworthy indication of a suicide risk").

[38]  See Smith v. City of Joliet, 1993 WL 18981, at *5 (N.D. Ill. 1993)-(detainee's "uncooperative, sometimes freaky manner" was not enough to alert officers that he might attempt suicide).

51

serious aberrant behavior, arresting officer was told by prisoner's father that prisoner suffered a mental breakdown, prisoner wore two medic alert bracelets, and jail records showed earlier attempted suicide).

## (2) Knowledge by the jailers

Deliberate indifference involves recklessly ignoring a known risk. Thus, a threshold determination must be made as to whether defendants were aware, or knew of the risk: *i.e.*, did Jackson County jailers know there was a strong likelihood Pitts would attempt suicide?

Prior to the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Eleventh Circuit applied an objective standard to determine whether jailers possessed knowledge of the risk. The court asked whether such officials knew, or should have known of an inmate's suicidal propensity. *See Popham*, 908 F.2d at 1564 ("[i]n the context of jail suicides, an allegation of deliberate indifference must be considered in light of the level of knowledge possessed by the officials involved, or that which should have been known as to an inmate's suicidal tendencies").

In *Farmer*, however, the Supreme Court squarely rejected the plaintiff's invitation to adopt a purely objective test for deliberate indifference. Instead, the court held there could be no liability "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substan-

52

tial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at __, 114 S.Ct. at 1979. Under the *Farmer* standard, "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot be considered a Constitutional deprivation. *Id.*

Even though *Farmer* specifically dealt with a prison official's Eighth Amendment duty to provide a convicted inmate with humane conditions of confinement, the Eleventh Circuit has applied its subjective definition of deliberate indifference as the appropriate standard for measuring the duty owed pretrial detainees under the Fourteenth Amendment's due process clause. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996)(applying *Farmer* analysis to an arrestee's claim of mistreatment[39] brought under Fourteenth Amendment due process clause). Additionally, other circuits have either explicitly or implicitly held the same. *see Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 635 (5th Cir. 1996)("We hold that the episodic act or omission of a state jail official does not violate a pretrial detainee's due process right to medical care or protection from suicide unless the official acted or failed to act with the subjective deliberate indifference to detainee's rights, as defined in *Farmer v. Brennan*..."); *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (5th Cir. 1995)(applying *Farmer's* subjective standard of deliberate indifference to pretrial

---

[39] "Arrestees" and "pretrial detainees" are treated comparably under the Fourteenth Amendment's due process clause instead of the Eighth Amendment's cruel and unusual punishment clause, which applies to claims by convicted prisoners. *Cottrell*, 85 F.3d at 1490.

53

detainee's medical care claim); *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995)(citing *Farmer* in applying deliberate indifference test to medical care claim).

### (3) Remoteness

The greater the time interval elapsing between a prior threat or attempt and the custodial suicide, the less likely courts are to find a "strong likelihood" that the detainee would commit suicide. For example, in *Kocienski v. City of Bayonne*, 757 F. Supp. 457, 465 (D. N.J. 1991), the court focused on two events that occurred prior to the custodial suicide of an inmate named Garity. Approximately two years before Garity's suicide, plaintiff (the sister of the deceased) called the defendant police to report that Garity was missing, and that she had "a history of psychological problems" and "emotional problems." *Id.* at 460. Approximately 18 months before Garity's suicide, the defendant police were called because Garity had overdosed, and the plaintiff again informed the police that Garity had a "history of depression and suicide." *Id.* at 460. The court concluded those two incidents "were simply too remote in time and too far divorced from the custodial officials in charge to attribute actual or constructive knowledge of Garity's psychological tendencies." *Id.* at 465.

Similarly, in *Hinkfuss v. Shawano County*, 772 F. Supp. 1104, 1114 (E.D. Wis. 1991), the court found "nothing on the record to indicate a strong likelihood [of] suicide" when three years and ten jailings separated a failed suicide attempt from a successful one.

Thus, the prior threat or attempt must not be temporally

54

remote from the custodial act; otherwise, it will not provide sufficient warning to impute knowledge of a "strong likelihood" of risk to a jail official.

### (4) Genuineness

The prior threat or attempt also must appear to have been genuine — unaffected by indicia of manipulative guile or pretense — in order to impart sufficient warning to a jailer. For example, in *Estate of Cartwright v. City of Concord*, 618 F. Supp. 722 (N.D. Cal. 1985), *aff'd*, 856 F.2d 1437 (9th Cir. 1988), the court determined that a suicide threat "overheard by jailers," but made under the influence of drugs or alcohol and in a "jocular" manner, did not furnish the jailers with sufficient reason to believe the decedent genuinely was suicidal. The following circumstances surrounded the threat:

> Cartwright [the deceased] and Daniello [another prisoner] were in their separate cells. There was loud and boisterous yelling between them, including laughing, shouting, joking, and vulgarity. Daniello faked a suicide, and when the jailers responded to it seriously, she bragged to Cartwright that she had fooled the jailers. Cartwright and Daniello continued their shouting and jocularity, or what the jailers reasonably believed was jocularity.

*Id.* at 728. The court said Cartwright's threat was "significant evidence for plaintiffs, and if considered alone might result in a duty on the part of defendants to take [protective] steps. However, the circumstances of the statement lead to a different conclusion." *Id.* at 728.

Another instructive case is *Bell v. Stigers*, 937 F.2d 1340 (8th Cir. 1991). In *Bell*, the district court denied summary

judgment for a police officer, holding there was a genuine issue of material fact as to whether a statement made by Bell (the deceased) to Stigers (the police officer) constituted a serious threat. Bell said, "[w]ell I think I'll shoot myself" as he and Stigers filled out an arrest report. *Id.* at 1341. The Eighth Circuit reversed, saying:

> The [district] court concluded that the jury should decide whether Bell's remark about shooting himself was a sufficiently serious threat to alert Stigers to Bell's suicide risk potential. We disagree. <u>A single off-hand comment about shooting oneself when no gun is available cannot reasonably constitute a serious suicide threat</u>. Bell's remark simply does not rise to a display of suicidal tendencies. Moreover, even if a listener more sensitive that Stigers might have taken the remark seriously, Stigers' failure to interpret it as a genuine manifestation of a suicide threat would at most consti- tute negligence, not deliberate indifference.

*Bell*, 937 F.2d at 1344 (emphasis supplied).

### (5) There was not a "strong likelihood" that Pitts would commit suicide

Guided by the foregoing principles, this court concludes the evidence does not demonstrate "a strong likelihood" that Pitts would commit suicide.

On August 24, 1993, the date Pitts last was arrested, he demanded that arresting officers take him to a doctor for "some xanax [be]cause he was very suicidal"; additionally, in the presence of Jackson County deputies, Pitts said to Dr. Charles Hillis: "I'm going to kill myself."[40] Those two statements represent the only prior threats or warnings of which the Jackson County Sheriff's department had knowledge. No person in the

---

[40] See discussion on pages 13-14, *supra*.

Jackson County jail was aware of Pitts' suicide attempts in Illinois, the wrist slashing incident on March 18, 1993, or his attempt to commit suicide by carbon monoxide poisoning in early August of 1993. Neither Culpepper nor Dr. Welcher informed jailers of any potential suicide risk, because they each concluded that Pitts was not suicidal.

Two statements made on the night of Pitts' arrest are not sufficient to establish a "strong likelihood" that he would kill himself over two months later. Pitts was irrational, violent, and intoxicated when he spoke those words. The evidence shows that Pitts only exhibited violent and/or self-detrimental behavior when he was under the influence of drugs or alcohol. As Jewel Pitts put it, her husband "never done anything unless he was drinking." (Plaintiff's Deposition, at 80.) Perhaps those statements provided sufficient warning to guard Pitts while he remained under the influence of alcohol or drugs the night of his arrest, or for a reasonable period following arrest, but they must be examined in the context of the totality of circumstances.

During Pitts extended period of confinement in the Jackson County Jail, he gave no further signs of suicidal ideation. In fact, with the exception of Pitts' one outburst after being refused permission to use the telephone, he displayed nothing but good behavior. Pitts' behavior was consistent with the assessment his parents related to Culpepper: *i.e.*, while incarcerated, their son generally was a model prisoner.

Even Pitts' letters to his wife provided no indication he was

57

contemplating suicide. To the contrary, those letters reflect plans for a more peaceful life following release from custody, plans which included giving up alcohol and strengthening his marriage. Thus, even Jewel Pitts did not have sufficient warning of suicidal tendencies to warrant warning her husband's jailers.

Given the fact that Pitts exhibited normal behavior for two months while incarcerated in the Jackson County Jail, two isolated statements on the night of his arrest, made under the influence of drugs or alcohol, do not impute sufficient warning to jail officials that Pitts was a serious suicide risk. Accordingly, this court concludes as a matter of law that the acts of the jail defendants cannot be construed as constituting deliberate indifference: stated differently, the evidence unequivocally fails to demonstrate a "strong likelihood" that Pitts would commit suicide in custody.

### b. Medical needs

Pitts' jailers clearly were aware of his serious medical needs: they twice took him to the hospital for treatment. Thus, the critical issue becomes: were they "deliberately indifferent" to his serious medical needs?

### 4. Were the Sheriff and Chief Deputy "deliberately indifferent" to Pitts' needs?

Plaintiff must show that the jail officials displayed "deliberate indifference"[41] to Pitts' serious medical needs.

---

[41] The Eleventh Circuit has noted the following distinction between deliberate indifference and negligence:

The distinction between deliberate indifference and negligence is

58

*Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir. 1989), *modified*, *reh'g denied*, *Edwards v. Okaloosa County*, 23 F.3d 358 (11th Cir. 1994).

### a. Mental health needs

Because the jail defendants did not have sufficient knowledge of Pitts' suicidal tendencies, it is not necessary to examine their actions in relation to his mental health needs. This court nevertheless has done so and concludes that, even if the jailers did have sufficient warning of a strong likelihood that Pitts would commit suicide, their actions do not reflect deliberate indifference to Pitts' mental health needs.

Neither Sheriff Wells nor Chief Deputy Miller had any direct contact with Pitts. Consequently, plaintiff seeks to hold them liable for failing to properly train their subordinate officers. She asserts that "Jackson County Jail's policy was seriously deficient in at least five areas: receiving screening, training, health screening, classification, and special needs treatment (access to mental health treatment, continuity of care and suicide prevention)." (Plaintiff's Brief, at 31.) It must be noted at the outset of the discussion which follows, however, that

[a] supervisory official is not liable under section 1983
for an injury resulting from his failure to train

conceptually vague because "indifference" generally implies a lack of attention by the actor similar to what the law often calls negligence. The modifier "deliberate," however, requires that the actor recklessly ignore the ... situation in the face of information that a reasonable person would know requires action.

Howell v. Evans, 922 F.2d 712, 720 n.7 (11th Cir. 1991), vacated as moot, 931 F.2d 711 (11th Cir. 1991), reinstated by unpublished order as noted, 12 F.3d 190 (11th Cir. 1994).

> subordinates unless his "failure to train amounts to deliberate indifference to the rights of the persons with whom the subordinates come into contact" and the failure has actually caused the injury of which the plaintiff complains.

*Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir. 1994)(quoting *Popham*, 908 F.2d at 1564-65)(emphasis supplied).

### (1) Providing access to mental health treatment

Jackson County jailers provided sufficient access to mental health treatment. They scheduled appointments with Dr. Cromeans, Stephen Culpepper, and Dr. Welcher (and transported Pitts to all meetings with Dr. Welcher). Additionally, they properly dispensed the medications prescribed by Drs. Cromeans and Welcher. Thus, the evidence does not support the conclusion that the jail defendants were deliberately indifferent to Pitts' serious mental health needs.

### (2) Screening and classification

Jackson County jailers were required to follow all policies implemented by Sheriff Wells. In 1993, that policy required jailers to observe all inmates at least once every thirty minutes. (Wells Deposition, at 36.) Jailers were trained to detect potentially suicidal inmates through in-house training sessions and information provided in the jail's written policy and procedures manual. (*Id.*, 64-65.) Inmates were classified and placed in cells in accordance with their medical conditions, their willingness to "get along" with other inmates, and the escape-risk potential attributed to each prisoner. (*Id.*, 40.)

The jail's general observation policy required that inmates

60

with mental problems, or those who were intoxicated be monitored more frequently than every thirty minutes. The time interval could vary from constant supervision to once every 15 minutes, depending on each situation. (*Id.*, 36-37.) Inmates considered suicidal were placed in two-person cells, so the other inmate could notify the jailers if assistance was needed. (*Id.*, 66.) At other times, suicidal inmates were placed in single cells, because it was easier to search and strip the inmate of anything harmful. (*Id.*, 67.) Pitts was considered to be a security or escape risk while in the Jackson County Jail, and he accordingly was monitored more closely than other prisoners.

Plaintiff asserts the jail's health and medical screening policies were grossly inadequate. Such arguments have been rejected by the Eleventh Circuit. *See Edwards,* 867 F.2d at 1276 (citing *Roberts v. City of Troy,* 773 F.2d 720 723, 725 (6th Cir. 1985)(holding plaintiff's argument that proper screening would have shown decedent fit profile of high suicide risk insufficient to establish deliberate indifference under any definition)); *see also Schmelz v. Monroe County,* 954 F.2d 1540, 1544 (11th Cir. 1992) (sheriff granted qualified immunity although he had no written suicide policy and only "made an effort to identify and protect potentially suicidal inmates from self-harm").

Plaintiff also points to weaknesses in the jail's training of deputies in the classification of inmates. Plaintiff asserts the policy was grossly inadequate when compared to guidelines established by two national organizations involved in inmate health

690/090.d  IÞ∠0 ISS S0S                    USDC HUNTSVILLE                    90:SI ∠66I-I2-ABW

care. The Eleventh Circuit has held, however, that "officials sued for constitutional violations lose no immunity simply because their conduct violates some state statute or regulation." *Edwards*, 867 F.2d at 1276 (discussing *Davis v. Sherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139, *reh'g denied*, 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984)); *see also Belcher v. Oliver*, 898 F.2d 32, 35-36 (4th Cir. 1990) (official who is sued for constitutional violations does not lose qualified immunity status simply because his conduct violates a statute or administrative regulation). Thus, if violations of Alabama state law do not establish deliberate indifference, then clearly variances from regulations promulgated by non-governmental entities will not suffice either.

Plaintiff asserts that Sheriff Wells and Chief Deputy Miller were aware of deficiencies in the jail, because several inmates have died therein, and two of the inmates died because they refused medical treatment while intoxicated. Plaintiff's argument is unavailing. The Eleventh Circuit refuted similar contentions when holding that "no authority ... supports the argument that the occurrence of two suicides and twenty-seven attempted suicides in the jail requires County officials to conclude that all prisoners of the Jefferson County Jail are substantially likely to attempt suicide." *Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1540 (11th Cir. 1994). Thus, the mere fact that other inmates have committed suicide in the Jackson County Jail does not compel the conclusion that all prisoners at the Jackson County Jail are likely to commit suicide.

62

Plaintiff also argues that jailers were put on notice of defective conditions by information provided in a Citizen's Jail Advisory Committee Report and two lawsuits against the jail. Although those documents do suggest that improvements are needed in the operation and physical structure of the jail, nothing contained therein establishes that the jailer's actions in this case constituted deliberate indifference.

This court concludes that there is no evidence to prove that Sheriff Wells and Chief Deputy Miller were deliberately indifferent to Pitts' serious mental health needs, or that any deliberately indifferent training or policy caused his death.

### b. Medical needs

The jailers' actions on November 1-2, 1993 were entirely reasonable. They twice took Pitts to the hospital and his condition was monitored during the interval between each trip. Plaintiff's own expert concedes, "the people at the jail performed as well as they could under the circumstances...." (Plaintiff's Exhibit 14: Affidavit of Dr. Charles E. Herlihy, Sr.).

Instead, plaintiff seems to suggest the Sheriff or his chief deputy had a duty to force Pitts to accept medical treatment. This court refuses to find a constitutional violation when a law enforcement officer fails to force an inmate to accept medical treatment, especially under the facts of this case, where Pitts repeatedly and aggressively refused medical advice and treatment. *See Cruzan v. Director of Missouri Dept. of Health*, 497 U.S. 261, 279, 110 S.Ct. 2841, 2852, 111 L.Ed.2d 224 (1990)("we assume that

63

the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition").

This court therefore finds that jail staff did not act with deliberate indifference to Pitts' medical needs. "A prison custodian is not the guarantor of a prisoner's safety." *Popham*, 908 F.2d at 1564 (citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir. 1988)). Accordingly, Pitts' § 1983 claims against Sheriff Wells and Chief Deputy Miller are due to be dismissed.

**E.    Is There a Causal Nexus Between Jackson County and the Conduct of Which Plaintiff Complains?**

"[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 384, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989). This court finds that plaintiff has failed to satisfy that threshold consideration.

There is no evidence in the record to suggest that Sheriff Wells and Chief Deputy Miller were implementing any policy or custom fashioned, sanctioned, or permitted by Jackson County. Additionally, there is no evidence that any such custom or policy was the "cause in fact" or "proximate cause" of Pitts' death. Thus, plaintiff has failed to establish a claim against defendants Jackson County and the Jackson County Commission.

Further, an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has

64

occurred. *See Vineyard v. County of Murray, Georgia*, 990 F.2d 1207, 1211 (11th Cir.), *cert. denied*, 510 U.S. 1024, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993). This court does not need to address whether Jackson County and the Jackson County Commission can be held liable for the policies of Sheriff Wells and Chief Deputy Miller, because plaintiff has failed to produce evidence that any act or omission on the part of Wells or Miller violated Pitts' constitutional rights. *See Williams v. Lee County, Alabama*, 78 F.3d 491, 493 (11th Cir. 1996)("We need not reach plaintiff's contention that Lee County is liable for the 'policies' of the Sheriff because the plaintiff failed to produce evidence that any act or omission on the part of [Sheriff] Chapman violated Williams' constitutional right"); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996)("Since we determined that Deputy Watson's conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom ...")(citations omitted).

For those reasons, plaintiff's § 1983 claims against Jackson County and the Jackson County Commission are due to be dismissed.

**F.   Were Any of the Acts of Which Plaintiff Complains the Cause —
Either in Fact or Proximately — of Her Decedent's Death?**

Ultimately, plaintiff's claims against all defendants fall on the element of causation. No act, or failure to act, by any defendant was the proximate cause of her husband's death. Actions by persons other than defendants intervened between Pitts' first trip to Jackson County Hospital just after midnight on November 2nd and his admission to University Hospital in Birmingham later that

day: *e.g.*, Dr. Gerlach permitted Pitts to leave the hospital without treatment, and without making a concerted effort to contact any family member; and, Dr. Hillis directed that Pitts be transferred to University Hospital by ground transport, rather than the air ambulance service requested by his parents, because Hillis did not consider Pitts' condition to be life-threatening. It also must be observed that the record is completely silent on the efforts to save Pitts' life undertaken by any staff of the ambulance service en route, or by physicians at University Hospital following his admission there. Such undisputed facts sever the causal cord connecting the events about which plaintiff complains and her husband's death.

Even so, this court now shall examine the acts of Stephen Culpepper and Dr. Wayne Welcher in the framework of their qualified immunity defenses.[42]

### IV. QUALIFIED IMMUNITY

Qualified immunity insulates governmental officials in their individual capacities from civil lawsuits, so long as the challenged discretionary conduct does not violate clearly established federal statutory or constitutional rights.

> An official performing discretionary functions has qualified immunity from damages liability under § 1983, so long as his or her conduct conforms to what a reasonable official would have believed lawful in light of

---

[42] Because this court concluded that Sheriff Wells and Chief Deputy Miller were not deliberately indifferent as a matter of law, this court need not address whether they are entitled to qualified immunity. *See Tompkins v. City of Hartshorne, Oklahoma*, 73 F.3d 374, 1995 WL 769004, at *3 (10th Cir. 1995) ("Because we hold that Officer Day did not violate plaintiffs' constitutional rights, we need not address whether he is entitled to qualified immunity").

66

> clearly established law and the information possessed by
> the particular official at the time of the challenged
> conduct.

Karen M. Blum, *Qualified Immunity: A User's Manual*, 26 Ind. L. Rev.
187 (1993). The basic formulation of the qualified immunity
standard, as it is currently applied, is set out in *Harlow v.
Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982),
and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d
523 (1987).

In *Harlow*, the Supreme Court established an objective standard
to make summary judgment an appropriate device to "avoid excessive
disruption of government and permit the resolution of many
insubstantial claims...." *Harlow*, 457 U.S. at 818, 102 S.Ct. at
2738. The Court held that "government officials performing
discretionary functions generally are shielded from liability for
civil damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a reason-
able person would have known." *Id.* Qualified immunity is intended
to give officials the ability to anticipate when their conduct may
give rise to liability for damages. *See Anderson v. Creighton*, 483
U.S. at 645, 107 S.Ct. at 3042 ("Where [the qualified immunity]
rule is applicable, officials can know that they will not be held
personally liable as long as their actions are reasonable in light
of current American law").

The burden placed on a plaintiff opposing a qualified immunity
defense is onerous.

> A plaintiff must establish more than broad legal truisms;
> he or she must demonstrate that the law fixed the

67

contours of the right so clearly that a reasonable
official would have understood his acts were unlawful.
... Thus, "pre-existing law must dictate, that is truly
compel (not just suggest or allow or raise a question
about), the conclusion for every like-situated, reason-
able government agent that what defendant is doing
violates federal law in the circumstances." *Lassiter v.
Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146,
1150 (11th Cir. 1994)(en banc). Moreover officials need
not "'be creative or imaginative in drawing analogies
from previously decided cases.'" *Id.* at 1150.

*Dolihite v. Maughon*, 74 F.3d 1027, 1040-41 (11th Cir.), *cert.
denied*, __ U.S. __, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996).

The Eleventh Circuit has framed the qualified immunity

standard as follows:

Once a defendant advances a defense of qualified
immunity, he is entitled to summary judgment unless "the
legal norms allegedly violated by the defendant were
clearly established at the time of the challenged
actions...." *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105
S.Ct. 2806, 2816, 86 L.Ed. 411 (1985). "The words
'clearly established ... constitutional rights' may not
be used to read the defense of immunity out of federal
tort law by the facile expedient of stating constitution-
al rights in the most general possible terms...." *Azeez
v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986). The
Supreme Court has stressed that "the right the official
is alleged to have violated must have been 'clearly
established' in a more particularized, and hence more
relevant, sense: The contours of the right must be
sufficiently clear that a reasonable official would
understand that what he is doing violates that right."
*Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034,
3039, 97 L.Ed.2d 523 (1987).

An official will be immune if "the law with respect
to [his] actions was unclear at the time the cause of
action arose" or if "'a reasonable officer could have
believed ... [his actions] to be lawful, in light of
clearly established law and the information ... [the
officer] possessed.'" *Clark v. Evans*, 840 F.2d 876, 879-
80 (11th Cir. 1988)(quoting *Anderson v. Creighton*, 107
S.Ct. at 3040). For purposes of qualified immunity, an
abstract mandate to act "with care" or "reasonably" is
too vague; "generalities are just not helpful." *Muhammad
v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987); *see
Clark v. Evans*, 840 F.2d at 881, 882 (proper inquiry is

"fact-specific"; officer who shot and killed fleeing
prisoner immune because "[n]o case ha[d] expressly held
that an officer has to first shoot to maim before
shooting to kill"). In sum, "the qualified immunity
defense ... provides ample protection to all but the
plainly incompetent or those who knowingly violate the
law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct.
1092, 1096, 89 L.Ed. 271 (1986).

*Edwards v. Gilbert*, 867 F.2d 1271, 1273 (11th Cir. 1989).

The Eleventh Circuit defines the district court's inquiry on

a motion for summary judgment asserting qualified immunity as

follows:[43]

[T]he relevant question on a motion for summary judgment
based on a defense of qualified immunity is whether a
reasonable official could have believed his or her
actions were lawful in light of clearly established law
and the information possessed by the official at the time
the conduct occurred.

*Stewart v. Baldwin County Bd. of Education*, 908 F.2d 1499, 1503

(11th Cir. 1990). Thus, this court must address whether the law

clearly establishes the conclusion that, at the time of defendants'

actions, a reasonable official, knowing what defendants knew, would

have realized such acts violated Pitts' constitutional rights.

In order for Culpepper or Dr. Welcher to be stripped of

qualified immunity, therefore, plaintiff must demonstrate their

treatment violated a clear and specific standard, so that similarly

---

[43] The Supreme Court elaborated the district court's role at the summary
judgment stage in noting that:

[o]n summary judgment, the judge appropriately may determine, not
only the currently applicable law, but whether that law was clearly
established at the time an action occurred. If the law at that time
was not clearly established, an official could not reasonably be
expected to anticipate subsequent legal developments, nor could he
fairly be said to "know" that the law forbade conduct not previously
identified as unlawful.

*Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (footnote omitted).

69

situated reasonable health care providers would have known their

actions violated Pitts' constitutional right. *See Adams*, 61 F.3d at

1543.[44]

> In a medical treatment case, a plaintiff may demonstrate
> the existence of a clearly established medical standard
> either through reference to prior court decisions or to
> the contemporary standards and opinions of the medical
> profession. *Howell* [*v. Evans*], 922 F.2d [712,] 719 [,
> *vacated*, 931 F.2d 711 (11th Cir. 1991), reinstated by
> unpublished order (June 24, 1991), cited in *Howell v.
> Burden*, 12 F.3d 190, 191 (11th Cir. 1994).] Plaintiffs
> frequently resort to the contemporary standards of the
> medical profession when the challenged action required
> the exercise of medical judgment. *Howell*, 922 F.2d at
> 719-20. In such an instance, a plaintiff may produce
> opinions of medical experts asserting that the inmate's
> treatment was so grossly contrary to accepted medical
> practices as to amount to deliberate indifference.
> *Howell*, 922 F.2d at 720.

*Adams*, 61 F.3d at 1543.

In *Dolihite v. Maughon*, 74 F.3d 1027 (11th Cir.), *cert.
denied*, __ U.S. __, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996), the
Eleventh Circuit discussed the proper procedure for determining the
existence of a clearly established medical standard through a
comparison of the actions of medical defendants to the actions of
past medical defendants in relevant case law.

> [I]n the context of health care professionals providing
> medical care, the core qualified immunity inquiry is
> exceedingly fact sensitive on both sides of the coin. On

---

[44] The Eleventh Circuit states that the issue to be resolved in determining
whether a medical defendant is entitled to qualified immunity is

> whether a reasonable doctor in the same circumstances and possessing
> the same knowledge as [the medical defendant] could have concluded
> that his actions were lawful, i.e., not deliberately indifferent to
> [the deceased's] psychiatric needs.

*Waldrop v. Evans*, 871 F.2d 1030, 1034 (11th Cir.), *reh'g denied*, 880 F.2d 421
(1989)(citing *Clark v. Evans*, 840 F.2d 876, 880 (11th Cir. 1988); *Anderson v.
Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040 (1987)).

70

the side of the coin involving the determination of
clearly established law, it is necessary to identify
precisely the acts and knowledge of the comparable actor
in controlling cases. On the side of the coin involving
the actions of the appealing public official, it is
necessary ... to identify precisely the actions and
knowledge of the appealing public official. ... [A]
plaintiff cannot rely upon general propositions or
abstractions to demonstrate a violation of clearly
established law; rather, the facts of the controlling
precedent must be materially similar to those in the
instant case.

*Dolihite*, 74 F.3d at 1035 n.2. Plaintiff asserts "[t]he <u>Greason</u>

decision shows how Culpepper [and] Welcher ... are not entitled to

qualified immunity."[45]   (Plaintiff's Brief, at 36.)   Yet, "[t]he

inquiry is more particularized and fact-specific" than such a vague

citation to case law.   *Waldrop*, 871 F.2d at 1034.   This court

concludes it is clear that the actions of Stephen Culpepper and Dr.

Welcher were not so egregious, in comparison to the Eleventh

Circuit cases, as to warrant the denial of their qualified immunity

defenses.

## A.   Culpepper's knowledge of Pitts at the time of the challenged treatment

Culpepper's only meeting with Pitts occurred on September 28,

1993.   At that time, he knew: (1) Pitts had exhibited violent

behavior on the night of March 18, 1993, when he cut his arms and

wielded the same knife against Scottsboro police officers;[46] and

(2) Pitts had telephoned the Jackson County Hospital on July 17th

---

[45]   Greason v. Kemp, 891 F.2d 829 (11th Cir. 1990), involved the denial of
qualified immunity to a health team leader at a state mental health center who
had received multiple warnings of a patient's suicidal tendencies, but took no
action.

[46]   See supra pp. 7-9.

71

and August 6th, 1993, threatening suicide and demanding to speak with him.[47]  Culpepper also was able to uncover the following facts during his meeting with Pitts.

1.   Pitts' uncle died "under mysterious circum-
     stances" - a self-inflicted gunshot wound.

2.   At age 15, Pitts had a friend die from a
     shotgun blast, "where blood and other organs
     were splattered on him."

3.   Pitts had a "[d]epressed mood most of the
     time, anxiety attacks with pacing and throwing
     up."

4.   Pitts "thinks about death and suicidal ideas
     but no plans."

(Mental Health Center Exhibit 14: Culpepper's Initial Contact Sheet with Pitts on September 28, 1993.)  On the other hand, Pitts did not disclose to Culpepper information about any of his past suicide attempts.  Pitts specifically denied ever being hospitalized for psychiatric reasons.  Additionally, as Culpepper noted, "[n]either Mr. Pitts' parents nor his wife gave me any information which indicated any past history [of] or current mental illness."  (Culpepper Affidavit, ¶ 3.)

### 1.   Comparing Culpepper's actions to those of prior medical defendants

Plaintiff asserts the following inadequacies in Culpepper's treatment should strip him of qualified immunity:

> Mr. Culpepper should have given a better warning to
> the jail, should have prepared a more thorough history
> concerning Marty, should have followed up on Marty's
> canceled appointments and documented the canceled
> appointments, and should have asked Marty and his family
> (particularly his wife) whether Marty had previously

---

[47] *See supra* note 7.

tried to commit suicide. Mr. Culpepper performed a grossly inadequate evaluation, assessment, and failed to have an adequate treatment plan or any adequate formulation of his problems, goals and methods of treatment. Furthermore, Culpepper should have informed Dr. Welcher in greater detail about Marty's history.

(Plaintiff's Brief, at 28.)

Eleventh Circuit cases that have denied therapists the defense of qualified immunity presented egregious circumstances.[48] For example, in *Dolihite*,[49] the court did not allow the primary therapist for a juvenile admitted to a state adolescent hospital to prevail on her qualified immunity defense when, with knowledge of a suicide attempt just two days before, the therapist removed the juvenile from "close observation status." Only forty minutes after doing so, the juvenile was found hanging in his dormitory room closet by a shoestring. *Dolihite*, 74 F.3d at 1037-39.

In *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990), a therapist in a state mental health center was denied qualified immunity when it was shown he knew an inmate "had been experiencing feelings of despair and thoughts of suicide, and on one occasion had attempted suicide by tying something around his throat." *Id.* at 832. The

---

[48] "The refusal to provide proper treatment must not simply be a medical choice but a gross violation of accepted practice. When the Supreme Court set up this standard in *Estelle [v. Gamble*, 429 U.S. 97, 105 n.10, 97 S.Ct. 285, 291 n.10 (1976)], it referred to two cases of grossly inadequate treatment: one where the doctor injected penicillin into a patient he knew to be allergic, the other where the doctor threw away a salvageable ear and stitched the stump." *Howell*, 922 F.2d at 721 n.9.

[49] *Dolihite* had not been authored at the time of Pitts' death and, therefore, its holding does not help in determining what the "clearly established law" was at the time of Pitts' death. However, when the actions of the medical defendants in this case are compared to those of the medical defendants in *Dolihite*, and to actions of medical defendants in prior Eleventh Circuit cases contrasted to the actors in *Dolihite*, it compels the conclusion that Culpepper and Dr. Welcher did not violate clearly established law.

73

suicide incident had been reported to the defendant by two inmates, and also by the inmate's parents. *Greason*, 891 F.2d at 832. Yet, the therapist did nothing: he did not notify the staff psychiatrist or put the inmate on suicide watch. The inmate hung himself only 21 days after the defendant's conversation with his parents.

Culpepper's actions are easily distinguished from the actions of the therapists in *Dolihite* and *Greason*, because Culpepper fully apprised Dr. Welcher of Pitts' past history of depression and all suicide threats known to him when referring Pitts for treatment. Culpepper developed Pitts' medical and personal history, conducted a mental status exam, and concluded that Pitts was not suicidal. Culpepper is not a medical doctor, and is not trained to provide professional medical treatment for mental disorders through prescription medication or otherwise. Therefore, Culpepper did what any reasonable therapist would do: he referred Pitts to a trained psychiatrist and provided Dr. Welcher with all information gathered from the conference with Pitts' parents and wife, and, his one meeting with Pitts. (Culpepper Deposition, at 123.)

Thus, this court concludes that a reasonable therapist, placed in Culpepper's situation, would have believed his or her actions in referring Pitts to a professional psychiatrist for treatment, simultaneously providing all relevant, available information regarding Pitts' condition, to be lawful in light of clearly established law.

**B. Dr. Welcher's knowledge of Pitts at the time of the challenged treatment**

Dr. Welcher began his treatment of Pitts on September 30,

74

1993. He had copies of Culpepper's records. Welcher thus was aware
of the March 18, 1993 incident, but not the two incidents in which
Pitts called the Jackson County Hospital threatening suicide in
July and August of 1993. (Welcher Deposition, at 64, 102-03.)[50]
Welcher also apparently knew something about Pitts' suicide
attempts in Illinois, because in deposition he commented: "[i]n the
back of my mind is this idea that he had made attempts many years
before." (*Id.*, 64.) Welcher learned that Pitts had admitted
himself to Columbia Valley Hospital in Chattanooga, Tennessee on
August 9, 1993 (*id*, 54), but he was not told that Pitts had
attempted suicide by carbon-monoxide poisoning on August 8, 1993.
(*Id.*, 96.)

### 1. Comparing Dr. Welcher' actions to those of prior medical defendants

Plaintiff asserts the following inadequacies in Dr. Welcher's
treatment:

> Dr. Welcher should have discussed Marty's case with
> Mr. Culpepper, should have taken a more thorough history,
> should have warned the jail of Marty's condition, should
> have kept track of whether Marty was receiving other
> medications that might interfere with the medications
> that he prescribed for Marty, should have spent more time
> with Marty, should have documented his records better,
> should have had an adequate treatment plan and adequate
> formulation of Marty's problems, goals, and method of
> treatment, and should have had Marty committed for a more
> in-depth study and treatment.

(Plaintiff's Brief, at 28.)

As discussed previously, the Eleventh Circuit implicitly

---

[50] Culpepper claimed records of those two incidents were in Pitts' file
(Culpepper Deposition, at 123), but Dr. Welcher did not recall having notice of
them.

75

requires proof of egregious circumstances to strip a physician of qualified immunity. An example is the case of in *Waldrop v. Evans*, 871 F.2d 1030 (11th Cir.), *reh'g denied*, 880 F.2d 421 (11th Cir. 1989). There, physicians withheld from an inmate psychotropic drugs which had successfully controlled the inmate's mental illness. Within 40 days, the inmate performed four separate acts of self-mutilation. The physicians, even with knowledge of those self-destructive acts, never re-instituted drug therapy in an attempt to stabilize and control the inmate's condition. Under those circumstances, the *Waldrop* court held that qualified immunity might not be available as a defense.

A comparison of Dr. Welcher's actions to those of Dr. Chester Jenkins in *Dolihite* also is instructive. The plaintiffs in *Dolihite* asserted that

> Dr. Jenkins failed to recognize David's [the juvenile's] obvious signs of clinical depression and bipolar disorder and to diagnose him accordingly. They contend that David's history of suicide threats and his family history of suicide, his increasing episodes of self-mutilation and mood swings should have led to that diagnosis. They assert that Dr. Jenkins should have prescribed intense and lengthy one-on-one therapy and antidepressant medication for David and that the failure to do so was a total departure from professional judgment.

*Dolihite*, 74 F.3d at 1046. The court noted that Dr. Jenkins knew the following information when he allegedly failed to recognized David's condition:

1. David's previous suicidal threats and gestures;

2. David's grandmother's suicide;

3. Dr. Maughon's initial diagnosis of David, "conduct disorder, solitary aggressive type";

76

4. David's January 26, 1992, deep possibly self-inflicted puncture wound to his left wrist and statement that he was going to "cut his arm off and kill himself";

5. A February, 2, 1992, incident when David wrote, "Oh, God I want to die, please take me or I'll commit suicide, Death, Suicide are the facts of life." on the security screen in his dormitory room;

6. A February 4, 1992, self-inflicted injury to the left wrist and the Progress Note of the same day indicating that David had been presenting as irrational;

7. A February 18, 1992, incident when David was talking to himself and telling a staff nurse that he was talking "to a friend who told him what to do";

8. A February 24, 1992, incident when David performed some allegedly Satanic ritual in his room, inflicted further injury to [his] left wrist, after which he told a mental health worker that the devil told him not to speak;

9. A March 8, 1992, incident when David cut his arm with a piece of metal in an apparently suicidal gesture, and after which he pulled out the stitches and refused new stitches;

10. A March 15, 1992, incident when David bled on the walls and defecated on the floor of the time out room; and,

11. A March 18, 1992, incident when David re-injured his left wrist by sticking a pencil in it, and was again sent to the emergency room.

*Dolihite*, 74 F.3d at 1048. Even given Dr. Jenkins' knowledge of so many warnings, the Eleventh Circuit nevertheless concluded his misdiagnosis did not rise to the level of a constitutional violation. The court compared Dr. Jenkins' actions to those of the doctors in the prior Eleventh Circuit opinions of *Greason*, 891 F.2d 829, *Rogers*, 792 F.2d 1052, and *Waldrop*, 871 F.2d 1030, and decided that "[p]laintiffs have not adduced facts to demonstrate that Dr. Jenkins' alleged departure from professional judgment was compara-

77

ble to that previously found to constitute a violation of constitu-
tional rights." *Dolihite*, 74 F.3d at 1048.[51]

This court concludes that Dr. Welcher's actions, at worst, are
comparable to those of Dr. Jenkins in *Dolihite*. Additionally, the
decedent in *Dolihite* was deserving of greater care because he was
a juvenile who was civilly committed, and clearly deserving of
"more considerate treatment in conditions of confinement than
criminals whose conditions of confinement are designed to punish."
*Dolihite*, 74 F.3d at 139. Thus, Dr. Welcher is entitled to
qualified immunity.

The alleged deficiencies in Dr. Welcher's treatment actually
are pale in comparison to the actions of medical defendants in
prior Eleventh Circuit cases. Each of the medical defendants in
*Greason*, *Rogers*, and *Waldrop* withdrew treatment or medication.
That was not the case here. Dr. Welcher continued (indeed,
increased) Pitts' medications. He met with Pitts several times,
evaluated his response to medication, and adjusted the prescription
accordingly. In fact, Pitts reported improvement in his condition

---

[51] In analyzing the actions of Dr. Jenkins, the Eleventh Circuit undertook

a fact-sensitive examination of controlling case law, particularly
Greason v. Kemp, 891 F.2d 829 (11th Cir. 1990). We must then
compare the facts in such case law (which have been determined to be
in violation of the Constitution) with the precise actions and the
precise knowledge of the actors in this case. For example,
appellant Dr. Jenkins in the instant case is comparable to the
psychiatrist in Greason. Dr. Jenkins' actions, and his knowledge at
the time, must be identified precisely and then compared to the
actions and knowledge of the psychiatrist in Greason. Only if the
actions of Dr. Jenkins, in light of his knowledge, are materially
similar to the actions and knowledge of the psychiatrist in Greason
can it be said that he could not have thought his actions were
lawful.

*Dolihite*, 74 F.3d at 1035 n.2.

78

due to his medications.

In *Greason*, 891 F.2d 829, the psychiatrist discontinued antidepressant medication for an inmate without instructing that the inmate be monitored for the adverse effects of discontinuing the medication. The psychiatrist discontinued the medication despite two letters in the patient's file from another psychiatrist and therapist, recommending that the inmate be maintained on medication. The psychiatrist in *Rogers*, 792 F.2d 1052, decided to treat the inmate's psychotic symptoms with placebos, which essentially is a withdrawal of medication. Additionally, the psychiatrist in *Waldrop*, 871 F.2d 1030, withdrew Lithium treatment and did not reinstate the drug, despite several graphic self-mutilating acts by the patient.

In comparing the facts in the *Dolihite* case to those in *Waldrop*, the court noted "that the self-injurious actions preceding David's final injury in this case are not comparable to those in *Waldrop*," and held that "the defendant-psychiatrist's inadequate response to the symptoms in *Waldrop* are not comparable to Dr. Jenkins' actions in this case."[52] *Dolihite*, 74 F.3d at 1949. In like manner, Pitts' self-injurious actions are not comparable to the decedents in *Dolihite* or *Waldrop*. Pitts' alleged suicide attempts were all initiated under the influence of alcohol, and

---

[52] The decedent in Waldrop had slashed his forearm, cut his scrotum, gouged out his left eye, and severely damaged his right eye. *Waldrop*, 871 F.2d at 1032-34.

were not considered to be serious attempts by his family members.[53]
Even though Dr. Welcher knew of some past suicide attempts, Pitts'
attempts would give no more room for caution than the past attempts
in *Dolihite* or *Waldrop* provided. Thus, in comparing Dr. Welcher's
treatment of Pitts to the psychiatrists in the above cases, it is
clear that a reasonable official in Dr. Welcher's position would
have concluded that he was not deliberately indifferent to Pitts'
situation.

**C.   Case law has not drawn a bright line staking out the medical
defendants' conduct as unconstitutional**

Ultimately, the crux of plaintiff's argument is: there was a
breakdown in communication between the medical defendants, which
resulted in a failure to procure possibly relevant medical records;
and that lack of information led to misdiagnosis and insufficient
medical care. When the actions of Dr. Welcher and Culpepper are
compared to those of the physician in *Dolihite*, however, it is
clear no constitutional violation occurred.

Dr. Welcher and Culpepper possibly should have investigated
further, communicated better, requested medical records, or spent
greater time evaluating Pitts. Even so, such inaction does not
constitute deliberate indifference. Prior case law has not drawn
a bright line staking out such conduct as unconstitutional. *See
Lassiter v. Alabama A & M, Board of Trustees*, 28 F.3d 1146, 1150
(11th Cir. 1994)("If case law, in factual terms, has not staked out

_____

[53]   Several of the members in the Pitts family did not consider Pitts'
earlier suicide attempts to be serious. In fact, Pitts' father thought that
Pitts was merely trying to get the attention of his wife, Jewel. (Charles Pitts,
Sr., Deposition, at 27.)

80

a bright line, qualified immunity almost always protects the defendant")(citations omitted).

In sum, because a comparison of the facts of this case to the actions of medical defendants related in pre-existing case law does not "truly compel" a finding that the medical defendants violated Pitts' constitutional rights, they will not be stripped of their qualified immunity defenses. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. City of Lancaster*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993).

## D. Expert Testimony Against Culpepper and Dr. Welcher

Plaintiff presents expert medical testimony through the affidavits and reports of: (1) Charles E. Herlihy, M.D., a board certified psychiatrist; and (2) Michael M. Holt, Ph.D., a practicing psychologist.[54] The Eleventh Circuit has indicated that medical experts can aid the court in determining whether qualified immunity is appropriate where allegations hinge upon the appropriateness of the actions of medical professionals, including mental health professionals. *See Dolihite*, 74 F.3d at 1046 (citing Eleventh Circuit cases).

Such expert medical testimony, making reference to specific deficiencies in a defendant's treatment and

---

[54] Dr. Welcher also presents the reports of Dr. Charles V. Ford, Professor and Director of U.A.B. Neuropsychiatry Clinic, and J. F. Hooper, Diplomate - American Board of Psychiatry and Neurology General and Forensic Psychiatry, who claim that Dr. Welcher met the standard of care. Dr. Hooper also refutes Dr. Holt's conclusions and asserts that Dr. Holt, a psychologist, is not qualified to give an opinion as to the standard of care rendered by a physician.

81

specific medically accepted standards might, in conjunc-
tion with the specific facts of a case, persuade a court
that the medical defendant's actions in the case were
clearly as great a departure from appropriate medical
standards as previous departures found unconstitutional
in prior cases — i.e., might persuade a court that a
reasonable professional in defendant's shoes would have
known that his challenged actions (or inaction) violated
plaintiff's constitutional rights.

*Dolihite*, 74 F.3d at 1046.

### 1. Dr. Herlihy's opinion

Dr. Herlihy's report suggests that Dr. Welcher and Culpepper

"performed a breach of the standard of care." (Plaintiff's Exhibit

14: Dr. Herlihy's Report, at 2.)  During deposition, Dr. Herlihy

said:

> Q:   The opinions that you've formed in this case
> you've formed based entirely on the review of
> documentary evidence, is that fair?
>
> A:   Yes.
>
> Q:   And let me be sure I'm clear about this too,
> Dr. Herlihy.  You are not saying that Dr.
> Welcher or Steve Culpepper or anyone else at
> the Marshall-Jackson Mental Health Center
> intentionally harmed or injured Marty Pitts,
> are you?
>
> A:   Oh, not with a flagrant conscious wish to do
> him harm ...
>
> . . .
>
> Q:   And just so I'm clear, your opinion is simply
> that they were negligent in failing to meet
> the appropriate standard of care, is that
> fair?
>
> . . .
>
> A:   Yes.

(Herlihy Deposition, at 141-42.)  An assertion of negligence is

insufficient to strip defendants of their qualified immunity

defense. *See Howell*, 922 F.2d at 722 n.10 ("When the [expert's] affidavit ... employs the established terminology of negligence and presents no factual allegations which a reasonable fact-finder could credit as deliberate indifference, the affidavit cannot alone establish a violation of a clear medical standard which can defeat qualified immunity"). Although Dr. Herlihy's responses to follow-up questions are couched in terms of the deliberate indifference standard, those assertions are merely conclusory. *See Rogers*, 792 F.2d at 1062 n.9 (approving the striking of medical expert's affidavit that was "phrased in conclusory terms without citing facts" after concluding the affidavit was "defective to create a factual dispute").

### 2. Dr. Holt's opinion

The affidavit of Dr. Holt notes that Culpepper violated several standards developed by the Alabama Department of Mental Health and Mental Retardation, by not properly following-up on Pitts' missed appointments, by not properly documenting information, and by not creating an initial assessment and treatment plan. Holt also asserts that Dr. Welcher did not properly document his information, and that he presented significant misinformation in his testimony about the assessment and diagnosis process. Finally, Dr. Holt comes to the conclusion that "the grossly inadequate assessment, documentation, examination, treatment formulation, and treatment process which was provided to Mr. Pitts prevented him from having an opportunity to deal with the obviously severe psychiatric problems that he had." (Affidavit of Dr. Holt, at 8;

Plaintiff's Exhibit 10.)

Dr. Holt's conclusory statement that Pitts' treatment was "grossly inadequate" does not delineate whether he is referring to the actions of Dr. Welcher, Culpepper, or both. *See Dolihite*, 74 F.3d at 1046-47 (criticizing expert affidavit that does not discuss doctors' actions separately). Dr. Holt does discuss the facts surrounding each doctor, and notes flaws in each of their actions before coming to his conclusion. Nevertheless, his affidavit "is conclusory and as such is of relatively little value in ... interpret[ing] ... the facts of this case." *Dolihite*, 74 F.3d at 1047.

### 3. Plaintiff's expert testimony does not aid this court

Expert opinions which merely express conclusory opinions, even if couched in the language of the relevant legal standard, are of little assistance. They do not assist this court in comparing the facts of this case to binding precedent. Accordingly, this court concludes that the facts adduced by plaintiff fail to show that the actions of Culpepper or Dr. Welcher were such a departure from professional judgment that a reasonable professional in their shoes would have known their actions violated Pitts' constitutional rights. Therefore, Culpepper and Dr. Welcher are entitled to qualified immunity.

## V. PLAINTIFF'S STATE LAW CLAIMS

In addition to plaintiff's § 1983 claims, she asserts several

state law claims.[55] Federal court jurisdiction over pendent state law claims is governed by 28 U.S.C. § 1367(a), which provides that

in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Under § 1367(c)(3), however, "the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if — ... (3) the district court has dismissed all claims over which it has original jurisdiction." By separate order, this court shall dismiss all federal claims that gave it original jurisdiction. Accordingly, this court declines to exercise supplemental jurisdiction over plaintiff's state law claims, and they shall be dismissed without prejudice to her right to pursue them in a state tribunal.[56]

## VI. CONCLUSION

For the foregoing reasons, this court concludes that all claims based upon 42 U.S.C. § 1983 are due to be dismissed. Additionally, this court declines to exercise supplemental

---

[55] Plaintiff asserts the following state law claims: (1) a wrongful death claim against all defendants based on Alabama Code § 6-5-410; (2) a claim for cruel or unusual punishment against all defendants based on Article I, Section 15 of the Alabama Constitution and Alabama Code § 14-3-52; (3) a "negligence per se" claim against defendants Jackson County, Jackson County Commission, Mike Wells, and Dennis Miller for alleged violations of Alabama Code § 14-6-105; and (4) a "negligence per se" claim against defendants Jackson County and Jackson County Commission for violations of several Alabama Code sections relating to the maintenance, operation, and funding of the Jackson County Jail.

[56] This court directs counsel to 28 U.S.C. § 1367(d), which tolls the limitations period on plaintiff's pendent state law claims for thirty days so that those claims may be refiled in state court.

85

jurisdiction over plaintiff's state law claims. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _2/st_ day of March, 1997.

United States District Judge